FILED
RICHARD W. NAGEL
CLERK OF COURT
2026 OCT -2 PM 2:03
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

2:26-cv-1187-MHW/CMV

**IN THE COURT OF COMMON PLEAS**
**FRANKLIN COUNTY, OHIO**

**S.P.**, on behalf of herself and all others similarly situated,

c/o Arlene Boruchowitz
MILBERG, PLLC
800 S. Gay Street, Suite 1100
Knoxville, TN 37929

Plaintiff,

vs.

**CENTRAL OHIO UROLOGY GROUP LLC,**

Defendant.

CASE NO.: 26-CV-006898

**DEFENDANT'S NOTICE OF FILING NOTICE OF REMOVAL**

Please take Notice that on September 21, 2026 Defendant Central Ohio Urology Group, LLC, filed a Notice of Removal pursuant to 28 U.S.C. § 1442, in the United States District Court for the Southern District of Ohio. A true and accurate copy of the Notice of Removal is attached hereto as Exhibit A.

In accordance with 28 U.S.C. §1446(d), this Court is respectfully requested to proceed no further in this action unless and until the action is remanded by order of the United States District Court for the Southern District of Ohio.



BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Telephone: 216.861.7634

Franklin County Ohio Clerk of Courts of the Common Pleas- 2026 Sep 24 2:02 PM-26CV006898

DATED: September 24, 2026

Respectfully submitted,

*/s/ David Carney*
*Counsel for Defendant*

David A. Carney (OH # 0079824)
dcarney@bakerlaw.com
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Telephone: 216.861.7634

**CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2026, a true and correct copy of the foregoing document was filed and served via the court's electronic filing system.

*/s/ David Carney*
*Attorney for defendant*



BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Telephone: 216.861.7634

```
09/25/26          MARYELLEN O'SHAUGHNESSY              CIV672D
             CLERK OF THE COURT OF COMMON PLEAS    PAGE    1 OF    3
                  FRANKLIN COUNTY, OHIO
                       CASE HISTORY

S P ET AL -VS- CENTRAL OHIO UROLOGY GROUP LLC
26 CVC 6898
FILED:   07/24/26
CASE IS CLOSED

    FILE
#   DATE   SUB# ACTN  DESCRIPTION          FIELD VALUES

    072426 0001 7998C HEARING/EVENT SCHED  3E 111626 0830 AM SC
                                         FICHE:        FRAME:        PAGES:      0
                      NARRATIVE - SYS GEN  ACTION HAS BEEN STRICKEN
    072426 0002 7998C HEARING/EVENT SCHED  3E 072627 0845 AM PT
                                         FICHE:        FRAME:        PAGES:      0
                      NARRATIVE - SYS GEN  ACTION HAS BEEN STRICKEN
    072426 0003 7998C HEARING/EVENT SCHED  3E 082327 0900 AM JT
                                         FICHE:        FRAME:        PAGES:      0
                      NARRATIVE - SYS GEN  ACTION HAS BEEN STRICKEN
    072426 0004 9850C JUDGE ASSIGN - ORIG      3E
                                         FICHE:        FRAME:        PAGES:      0
 1  072426 0005 6205  CLRK ORIG CASE SCHED
                                       I FICHE: OH958  FRAME: H76    PAGES:      2
 2  072426 0006 5775  JURY DEMAND - PLNTF
                                       I FICHE: OH958  FRAME: G96    PAGES:     78
 3  072426 0007 6530  ATTY APR             ARLENE L. BORUCHOWITZ          S P
                                         FICHE:        FRAME:        PAGES:      0
 4  072426 0008 6530  ATTY APR             ARLENE L. BORUCHOWITZ          S P
                                         FICHE:        FRAME:        PAGES:      0
 5  072426 0009 6530  ATTY APR             KEVIN M. COX                   S P
                                         FICHE:        FRAME:        PAGES:      0
 6  072426 0010 6530  ATTY APR             KEVIN M. COX                   S P
                                         FICHE:        FRAME:        PAGES:      0
 7  072426 0011 6530  ATTY APR             CLINT C. WATSON                S P
                                         FICHE:        FRAME:        PAGES:      0
 8  072426 0012 6530  ATTY APR             CLINT C. WATSON                S P
                                         FICHE:        FRAME:        PAGES:      0
 9  072426 0013 6530  ATTY APR             JOSEPH M. LYON                 S P
                                         FICHE:        FRAME:        PAGES:      0
10  072426 0014 6530  ATTY APR             JOSEPH M. LYON                 S P
                                         FICHE:        FRAME:        PAGES:      0
11  072426 0015 5305  COMPLAINT FILED
                                       I FICHE: OH958  FRAME: G96    PAGES:     78
    072426 0016 5410C REQ FOR SERV - CERT  01 D CENTRAL OHIO UROLOGY GROUP L
                                       I FICHE:        FRAME:        PAGES:      1
12  072726 0001 6667  APPLIED - SP DOCKET  2.00 P S P
                                         FICHE:        FRAME:  00    PAGES:      0
13  072726 0002 6675  APPLIED - CLERK      25.00 P S P
                                         FICHE:        FRAME:  00    PAGES:      0
14  072726 0003 6660  APPLIED-COMP LGL FEE 6.00 P S P
                                         FICHE:        FRAME:  00    PAGES:      0
15  072726 0004 6665  APPLIED-COURT CMPTR  20.00 P S P
                                         FICHE:        FRAME:  00    PAGES:      0
16  072726 0005 6670  APPLIED - LEGAL AID  26.00 P S P
                                         FICHE:        FRAME:  00    PAGES:      0
```

```
09/25/26                    CASE HISTORY                        CIV672D
26 CVC 6898                                                PAGE    2 OF    3
S P ET AL -VS- CENTRAL OHIO UROLOGY GROUP LLC

    FILE
#   DATE    SUB# ACTN  DESCRIPTION           FIELD VALUES

 17 072726 0006 6691  APPLD E-FILE CHARGE   1.00 P S P
                                         FICHE:          FRAME:  00    PAGES:      0
 18 072726 0007 6634  APPLD - DEP FOR COST 145.00 P S P
                                         FICHE:          FRAME:  00    PAGES:      0
 19 072726 0008 6699  SECURITY DEP RECVD   225.00 P S P
                                         FICHE:          FRAME:  00    PAGES:      0
 20 072826 0001 5810  POS ISS - CERT MAIL  503866080559 01   D CENTRAL OHIO URO
                                       I FICHE: E4510   FRAME: C31    PAGES:      1
 21 072826 0002 6220  SUMMONS ISSUED
                                       I FICHE: E4510   FRAME: F85    PAGES:      1
    081826 0001 5410C REQ FOR SERV - CERT  01 D CENTRAL OHIO UROLOGY GROUP L
                                       I FICHE:         FRAME:        PAGES:      1
 22 081826 0002 8883  CHANGE OF ADDRESS    D CENTRAL OHIO UROLOGY GROUP L
                                         FICHE:         FRAME:        PAGES:      0
 23 081926 0001 5810  POS ISS - CERT MAIL  503866123201 01   D CENTRAL OHIO URO
                                       I FICHE: E4526   FRAME: W06    PAGES:      1
                      NARRATIVE - SYS GEN  RETURNED - SERVED          082126
 24 081926 0002 6220  SUMMONS ISSUED
                                       I FICHE: E4526   FRAME: X96    PAGES:      1
    082526 0001 5410C REQ FOR SERV - CERT  01 D CENTRAL OHIO UROLOGY GROUP L
                                       I FICHE:         FRAME:        PAGES:      1
 25 082526 0002 8883  CHANGE OF ADDRESS    D CENTRAL OHIO UROLOGY GROUP L
                                         FICHE:         FRAME:        PAGES:      0
 26 082626 0001 5810  POS ISS - CERT MAIL  503866134818 01   D CENTRAL OHIO URO
                                       I FICHE: E4531   FRAME: E29    PAGES:      1
                      NARRATIVE - SYS GEN  RETURNED - SERVED          090126
 27 082626 0002 6220  SUMMONS ISSUED
                                       I FICHE: E4531   FRAME: G20    PAGES:      1
 28 082626 0003 6310  SERV COMP -CERT MAIL     082126 CENTRAL OHIO UROLOGY GROU
                                       I FICHE: E4530   FRAME: J38    PAGES:      1
    090326 0001 5410C REQ FOR SERV - CERT  01 D CENTRAL OHIO UROLOGY GROUP L
                                       I FICHE:         FRAME:        PAGES:      1
 29 090326 0002 8883  CHANGE OF ADDRESS    D CENTRAL OHIO UROLOGY GROUP L
                                         FICHE:         FRAME:        PAGES:      0
 30 090426 0001 5810  POS ISS - CERT MAIL  503866153666 01   D CENTRAL OHIO URO
                                       I FICHE: E4538   FRAME: A90    PAGES:      1
 31 090426 0002 6220  SUMMONS ISSUED
                                       I FICHE: E4538   FRAME: D33    PAGES:      1
 32 090826 0001 6310  SERV COMP -CERT MAIL     090126 CENTRAL OHIO UROLOGY GROU
                                       I FICHE: E4538   FRAME: I33    PAGES:      1
    091726 0001 9279C ORIG COPY HEAR NOTC  111626 0830 AM 3E SC
                                         FICHE:         FRAME:        PAGES:      0
    091726 0002 9279C ORIG COPY HEAR NOTC  111626 0830 AM 3E SC
                                         FICHE:         FRAME:        PAGES:      0
    091726 0003 9279C ORIG COPY HEAR NOTC  111626 0830 AM 3E SC
                                         FICHE:         FRAME:        PAGES:      0
    091726 0004 9279C ORIG COPY HEAR NOTC  111626 0830 AM 3E SC
                                         FICHE:         FRAME:        PAGES:      0
```

09/25/26 CASE HISTORY CIV672D
26 CVC 6898 PAGE 3 OF 3
S P ET AL -VS- CENTRAL OHIO UROLOGY GROUP LLC

| # | FILE DATE | SUB# | ACTN | DESCRIPTION | FIELD VALUES |
|---|---|---|---|---|---|
| 33 | 092426 | 0001 | 6530 | ATTY APR | DAVID CARNEY CENTRAL<br>FICHE: 0I057 FRAME: G88 PAGES: 3 |
| 34 | 092426 | 0002 | 8000 | TERMINATE CASE | 26CV00689802<br>FICHE: FRAME: PAGES: 0 |
| 35 | 092426 | 0003 | 9224 | NOTICE OF FILING | FICHE: 0I057 FRAME: G88 PAGES: 3 |
| 36 | 092426 | 0004 | 6730 | REMOVE TO U.S..DC | FICHE: 0I057 FRAME: G88 PAGES: 3 |
| 37 | 092426 | 0005 | 9224 | NOTICE OF FILING | FICHE: 0I057 FRAME: G91 PAGES: 128 |
| 38 | 092526 | 0001 | 9950 | STRIKE SCHED DATE | 3E 111626 0830 AM<br>FICHE: FRAME: PAGES: 0 |
| 39 | 092526 | 0002 | 9950 | STRIKE SCHED DATE | 3E 072627 0845 AM<br>FICHE: FRAME: PAGES: 0 |
| 40 | 092526 | 0003 | 9950 | STRIKE SCHED DATE | 3E 082327 0900 AM<br>FICHE: FRAME: PAGES: 0 |

**MARYELLEN O'SHAUGHNESSY**

**FRANKLIN COUNTY CLERK OF COURTS**
**COURT OF COMMON PLEAS GENERAL DIVISION**

**JAIZA N PAGE**

**CASE TITLE: S P ET AL -VS- CENTRAL OHIO UROLOGY GROUP LLC** **CASE NUMBER: 26CV006898**

## CLERK'S ORIGINAL CASE SCHEDULE

| | **LATEST TIME OF OCCURRENCE** |
|---|---|
| CASE FILED | 07/24/26 |
| INITIAL DISCLOSURES OF THE PARTIES [CIV. R. 26(B)(3)] | 09/18/26 |
| DISCOVERY CONFERENCE OF COUNSEL AND UNREPRESENTED PARTIES [CIV. R. 26(F)] | 10/16/26 |
| JOINT DISCOVERY PLAN TO BE FILED | 14 DAYS AFTER PARTIES DISCOVERY CONFERENCE |
| CASE MANAGEMENT/PRETRIAL CONFERENCE WITH COURT | 11/16/26 0830AM |
| EXPERT WITNESS [CIV. R. 26(B)(7)] | |
| DISCLOSE IDENTITY - PARTY WITH BURDEN | 12/21/26 |
| DISCLOSE IDENTITY - PARTY WITHOUT BURDEN | NO LATER THAN 30 DAYS AFTER OPPOSING DISCLOSURE |
| EXPERT REPORT & CV DUE - PARTY WITH BURDEN | 01/18/27 |
| EXPERT REPORT & CV DUE - PARTY WITHOUT BURDEN | NO LATER THAN 45 DAYS AFTER OPPOSING REPORTS |
| DISPOSITIVE MOTION DEADLINE | 03/22/27 |
| DISCOVERY CUTOFF DATE | 04/19/27 |
| FINAL PRETRIAL CONFERENCE | 07/26/27 0845AM |
| TRIAL ASSIGNMENT | 08/23/27 0900AM |

Franklin County Ohio Clerk of Courts of the Common Pleas- 2026 Jul 24 11:40 AM-26CV0[illegible]

## NOTICE TO ALL PARTIES

Attorneys and unrepresented parties must become familiar with the 2020 amendments to the Ohio Rules of Civil Procedure and this court's Local Rules.

The Original Case Schedule is an important tool to assist the parties and the court in meeting case management guidelines in the Ohio Superintendence Rules, and otherwise achieving timely disposition of civil cases notwithstanding the priority given to criminal cases under Crim. R. 50.

Judicial Officers of this court may modify the Original Case Schedule following receipt of the parties' Joint Discovery Plan, or for good cause at any other point in the case. However, it is essential for attorneys and unrepresented parties to pursue their cases diligently from the outset. Deadlines set in the Rules and in this Original Case Schedule are normally binding, not merely aspirational.

**IN THE COURT OF COMMON PLEAS**
**FRANKLIN COUNTY, OHIO**

| | |
|---|---|
| **S.P.**, *on behalf of herself and all others similarly situated,*<br><br>c/o Arlene Boruchowitz<br>MILBERG, PLLC<br>800 S. Gay Street, Suite 1100<br>Knoxville, TN 37929<br><br>Plaintiff,<br><br>v.<br><br>**CENTRAL OHIO UROLOGY GROUP, LLC,**<br><br>620 Morrison Road, Suite B<br>Gahanna, Ohio 43230<br><br>Defendant. | Case No.<br><br>Judge<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff S.P., at all times relevant herein, was a patient of Central Ohio Urology Group, LLC ("COUG" or "Defendant"), and used Defendant's website for a variety of healthcare services. Plaintiff brings this class action against Defendant in her individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions, her counsel's investigation, and upon information and belief as to all other matters, as follows:

1. Plaintiff brings this case to address Defendant's unlawful practice of collecting, disclosing, and monetizing Plaintiff's and Class Members' confidential personally identifiable information ("PII"), confidential health communications ("CMC"), and protected health information ("PHI") (collectively referred to as "Private Information") to third parties, including

Google, Inc. ("Google"), without consent, through the use of tracking software that was implemented, configured, and embedded in Defendant's website.

2. Defendant is a leading urological practice in the Columbus, Ohio region that provides comprehensive urological care and operates the website https://www.centralohiourology.com/ (the "Website or Defendant's Website"). Defendant holds its Website out to the public, including Plaintiff and Class Members, as a method of marketing its healthcare services and offering its patients access to a variety of online services.

3. Defendant is a HIPAA covered healthcare entity and thus its disclosure and use of Private Medical Information for marketing is tightly regulated. The United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

4. Defendant encourages its patients, including Plaintiff and Class Members, to utilize the Website as a confidential means of searching for medical services, scheduling medical appointments with Defendant, completing registration forms, paying bills, and accessing online medical records.

5. Plaintiff and Class Members had a reasonable expectation of privacy when utilizing the Website for healthcare services including when searching for specific health conditions, searching for specific physicians, scheduling medical appointments, completing registration forms, paying bills, and accessing the online Modernizing Medicine portal.

6. Defendant owed its patients, including Plaintiff and Class Members, multiple legal duties to protect the Private Information it collected and stored through its Website. These duties included common law, contractual, and statutory duties to protect against the disclosure and misuse of Plaintiff's confidential health and medical communications.

7. Although Plaintiff is presently unaware of every type of pixel and tracking tool that Defendant deployed during the relevant time period, "Tracking Tools" refers to any technology that divulges confidential information to an unauthorized third-party that: (1) has not executed a HIPAA-compliant business associate agreement with Defendant; and (2) for which patients did not execute a HIPAA-compliant marketing authorization.

8. As used herein, the term "Tracking Tools" includes (1) Google Analytics, the Google Tag Manager, similar tools offered by Google in conjunction with its marketing products and other platforms (such as "DoubleClick" and "YouTube"); and (2) Facebook or Meta's Pixel and other "Business Tools" it provides to marketers.

9. The Tracking Tools' specific purpose is to provide website owners with the ability to acquire the raw web user data and to then transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. The Tracking Tools are offered for "free" to companies like Defendant but require the website owner to share and disclose web users' valuable behavioral web browsing data with the Unauthorized Third-Party Marketer.

10. Google, and other ad tech companies are similarly motivated. Google's online advertising business generated 42.4 percent of global digital ad revenue in 2023.[1]

[1] *Global Digital Advertising Revenues – A Look at the Big Three*, VISIBLE ALPHA (May 17, 2023), https://visiblealpha.com/blog/global-digital-advertising-revenues-a-look-at-the-big-three-alphabet-googl-meta-platforms-meta-amazon-com-amzn/ (last visited June 30, 2026).

11. With the intent to monetize the patient information flowing through its Website, Defendant installed Tracking Tools from the Unauthorized Third-Party Marketers onto its Website, which provided Defendant with valuable marketing tools to create more efficient and profitable marketing campaigns.

12. In implementing the Tracking Tools, however, Defendant deprived Plaintiff and Class Members of their privacy and property rights by: (1) surreptitiously tracking, recording, and aggregating Plaintiff's and Class Members' confidential communications and Private Information; (2) causing Plaintiff's and Class Members' communications to be disclosed and intercepted by Unauthorized Third-Party Marketers ; (3) utilizing the Private Information for marketing purposes, and (4) converting and monetizing the Private Information through various marketing tactics, which, upon information and belief, included, audience building, retargeting, geo-location, and other invasive marketing tactics. At no point along the data monetization process did Defendant obtain proper express written consent from Plaintiff or Class Members for any of these tortious acts.

13. Indeed, by deploying a combination of Meta and Google tracking tools, Defendant maximized the exposure of its patients' and prospective patients' Private Information to the valuable advertising ecosystems in order to gain the highest probability of converting new patients with the lowest cost per conversion of a new patient.

14. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule, PHI is defined as individually identifiable health information ("IIHI") that relates to a person's past, present, or future physical or mental health, the delivery of health care services, or

payment of health care. Data is identifiable under HIPAA if it directly identifies the individual or there is a reasonable basis it could be used to identify the individual.[2]

15. A covered entity, like Defendant, cannot disclose a person's PHI to a third party or utilize a person's PHI for marketing purposes without express written authorization.

16. Plaintiff's and Class Members' browsing and behavioral Website data qualifies as PHI because the data (1) related to the past, present and future medical care of the patient and (2) the data was sent in combination with direct and indirect identifiers from which the Plaintiff and Class Members could be reasonably associated with the data.

17. At a minimum, the information COUG divulged to the Unauthorized Third-Party Marketers allowed them to learn that specific individuals were patients seeking or receiving treatment, at COUG clinics and other related medical centers. In and of itself, this type of data reveals the fact that an individual is being treated for urology-related medical conditions.

18. Specifically, the Tracking Technology collected and disclosed to Google contained Plaintiff's and Class Members' confidential communications in the form of the descriptive page URLs from the pages Plaintiff and Class Members searched and viewed, including the most sensitive parts of the Website, including: (a) the Contact a Clinic page, (b) services pages, (c) conditions pages, (d) the locations pages (e) Bill Pay page, and (f) Doctor pages ("Private Search/Page View Data"). The Tracking Technology also collected and disclosed specific actions taken by the Plaintiff and Class Members (i.e., events) on those pages. The events include clicks, views, and entering information on forms on the log-in page (Collectively, "Private Search/Page View Data" and "Private Page Click Data" will be referred to as "Private Browsing Information").

[2] 45 C.F.R. § 160.103.

19. In combination with the disclosure of the Private Browsing Information, the Tracking Tools collected and disclosed unique personal identifiers, including: tracking IDs, timestamps, Google IDs, Meta IDs, device IDs and various data used for browser fingerprinting. While appearing anonymous, the unique identifiers are unique data points from which Google and Meta can either directly identify with their records or easily cross-reference with other expansive data sets to connect and identify the Plaintiff and Class Members with the specific Private Browsing Information.[3]

20. Google, for example, can easily connect patient data from Defendant's Website to the individual patient's Google Account (cid) which is linked to the users' Google account and contains additional details about their identity. Google "stores users' logged-in identifier on non-Google websites…in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads." [4]

21. Simply put, the health information disclosed through the Tracking Tools is personally identifiable health information and is the digital equivalent of disclosing a

[3] Defendant's Meta Pixel has its own unique identifier (represented as id=4655432104470418), which can be used to identify which of Defendant's webpages contain the Meta Pixel. Separately, "Google Analytics stores a client ID in a first-party cookie named _ga to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage is disabled through Consent Mode." https://support.google.com/analytics/answer/11593727?hl=en#:~:text=Google%20Analytics%20stores%20a%20client,is%20disabled%20through%20Consent%20Mode. (last visited June 30, 2026).

[4] *See Brown v. Google LLC*, 685 F. Supp. 3d, 909(N.D. Cal. Aug. 7, 2023) (Order denying summary judgment and citing internal evidence from Google employees).

comprehensive patient list to Google or Meta. Indeed, the Unauthorized Third-Party Marketers each offer Tracking Tools free of charge, but the price that Defendant paid was the intercepted patient data. Effectively, Defendant traded its patient list for access to the "free" marketing tools.

22. The HIPAA Safe Harbor rule allows for a limited data set[5] of PHI to be disclosed provided (1) specific direct identifiers are removed from the data set and (2) the recipient enters into a Business Associate Agreement ("BAA") promising certain safeguards. Here, the identifiers were not removed, and there was no BAA signed-- so the Safe Harbor would not apply. Moreover, it is well recognized that Google and Meta will not execute BAAs with healthcare providers related to the transmission of data from health services websites.

23. To be sure, there are many analytics companies and marketing campaigns that are HIPAA compliant that would have prevented Defendant's tortious acts; but Defendant opted for known non-HIPAA compliant analytics and marketing tactics to take advantage of the free services and gain access to powerful analytics, audience building, and re-targeting tools.

24. Indeed, the Office for Civil Rights at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online Tracking Tools. The Bulletin expressly provides (in bold type) that "**[r]egulated entities are not**

[5] 45 C.F.R. § 164.514(e). A limited data set is protected health information that excludes the following direct identifiers of the individual or of relatives, employers, or household members of the individual: (i) Names; (ii) Postal address information, other than town or city, State and zip code; (iii) Telephone numbers; (iv) Fax numbers; (v) Electronic mail addresses: (vi) Social security numbers; (vii) Medical record numbers; (viii) Health plan beneficiary numbers; (ix)Account numbers; (x) Certificate/license numbers; (xi) Vehicle identifiers and serial numbers, including license plate numbers; (xii) Device identifiers and serial numbers; (xiii) Web Universal Resource Locators (URLs); (xiv) Internet Protocol (IP) address numbers; (xv) Biometric identifiers, including finger and voice prints; (xvi) Full face photographic images and any comparable images. 45 C.F.R. § 164.514(e)(2).

**permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.**" In other words, HHS has expressly stated that COUG's implementation of Tracking Tools violated HIPAA Rules.

25. The Federal Trade Commission (FTC) has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."

26. Defendant's actions described below in detail violated HIPAA Rules, yet Defendant has taken no action to modify its conduct following the release of numerous class action settlements around the country and by two large local Cincinnati, Ohio-based Hospital systems for the same conduct.[6]

27. Despite its duties, representation, and warnings, and without any form of consent from Plaintiff or Class Members, Defendant implemented and configured a variety of surreptitious tracking technologies on the Website with the intent to collect and analyze its patients and prospective patients' online behavioral data to enhance and profit from its digital marketing programs.

28. The Tracking Tools are typically used to collect and then analyze web users' behavioral data in order to then identify, target, and market products and services to specific audiences built with the assistance of Meta and Google algorithms and computing.

---

[6] *See Doe v. Bon Secours Mercy Health*, Hamilton C.P. No. A 2002633 (Oct. 17, 2025) (Order granting Final Approval of Settlement); *In Re the Christ Hospital Pixel Litig.*, Hamilton C.P. No. A 2204749 (Oct. 29, 2025) (Order granting Final Approval of Settlement).

29. Upon information and belief, Defendant utilized the Tracking Tools to monetize its patients' and prospective patients' data, including Plaintiff and Class Members, but collecting the data, analyzing the data, and then targeting its patients and prospective patients with marketing campaigns intended to drive more users to the website and convert more scheduled medical services. The marketing tactics likely included creating tracking parameters, customizing and optimizing its website, building custom audiences, and launching digital campaigns.

30. Before Defendant could disclose the Private Information or use it for marketing purposes, it was required to obtain express written consent from each patient and prospective patient.

31. Defendant, however, acted secretly and did not disclose the presence of these Tracking Tools to Plaintiff or Class Members. Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Meta or Google or allowing Defendant to use their PHI for marketing purposes.

32. Consequently, Defendant breached its common law, contractual, and statutory duties by: (1) implementing and configuring the Tracking Tools that secretly recorded and surveilled Plaintiff's and Class Members' Private Medical Communications with Defendant; (2) disclosing Plaintiff's and Class Members' Private Information to Google and Meta without express written consent by each patient; (3) disclosing Plaintiff's and Class Members' Private Medical Information to Google without Business Associate Agreement(s); and (4) using Plaintiff's and Class Members' PHI for marketing purposes without express written consent from each patient.

33. In sum, through the use of Tracking Tools, Defendant intentionally transmitted Plaintiff's and Class Members' highly sensitive communications and Private Information to Unauthorized Third-Party Marketers, including communications that contained private and

confidential health information; and further, Defendant utilized marketing tools and tactics with the intent of monetizing the Plaintiff's and Class Members' highly sensitive communications and Private Information. Neither Plaintiff nor any Class Member signed a written authorization permitting Defendant to disclose or use their Private Information for marketing purposes.

34. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of fiduciary duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

35. Consequently, Plaintiff individually and on behalf of the putative Class, brings this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiff and the putative Class have suffered and seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), statutory damages, and in the alternative, nominal damages. Plaintiff further seeks restitution, disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to address the ongoing , ( of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

36. Plaintiff seeks to remedy these harms and brings causes of action for (1) Invasion of Privacy (2) Breach of Fiduciary Duty; (3) Breach of Implied Contract; (4) Unjust Enrichment; (5) Interception and Disclosure of Electronic Communications in Violation of Ohio Rev. Code §

2933.52; (6) Breach of Confidence (*Biddle*); and (7) Civil Liability for Criminal Actions under R.C. § 2307.60, *et seq*.; (8) negligence.

## PARTIES

37. Plaintiff S.P. is a natural person and citizen of Ohio where she intends to remain.

38. Defendant Central Ohio Urology Group, LLC is a health care provider that is organized in Ohio as a limited liability company with a principal place of business located at 620 Morrison Road, Suite B, Gahanna, Ohio 43230.

39. COUG is a leading urological practice in the Columbus, Ohio region that focuses on comprehensive urological condition and treatment services. COUG conducts the majority of its business in Ohio where it has 16 locations.[7]

40. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

## JURISDICTION & VENUE

41. This Court has subject matter jurisdiction over this action under R.C. 2305.01 and R.C. 1345.04.

42. This Court has personal jurisdiction over Defendant because the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

43. Venue is proper in Franklin County under Civ. R. 3(C)(3) because Defendant's principal place of business is in Franklin County.

[7] https://www.centralohiourology.com/locations/ (last visited June 30, 2026).

## COMMON FACTUAL ALLEGATIONS

### A. Duty of Confidentiality

44. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

45. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

46. The AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including, … personal data (informational privacy) . . . .

47. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. ***Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship.*** Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified.[][and] ; (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about) the purpose(s) for which access would be granted.

48. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. ***Physicians who collect or store patient information electronically…must…: [r]elease patient information only in keeping with ethics guidelines for confidentiality and privacy.***

**B. Expectation of Privacy**

49. At all times when Plaintiff and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

50. Plaintiff and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

51. A patient's web activity and Private Information includes page views of medical information, page views of specific physicians, form completions requesting a medical appointment, clicks on log in buttons for access to a patient portal, and form completions paying a medical bill, all of which relate to the past, present, and future medical care of that individual. Moreover, that web activity when combined with unique identifiers that can connect the web activity with a specific person is PHI under HIPAA.

52. Defendant deprived Plaintiff and Class Members of their privacy rights when it intentionally, and/or recklessly, and/or negligently: (1) implemented and configured several Tracking Tools on its Website that surreptitiously tracked, surveilled, and recorded Plaintiff's and Class Members' PHI, (2) disclosed Plaintiff's and other Class Members' PHI to unauthorized third parties (i.e., Google and Meta); (3) utilized Plaintiff's and Class Members' PHI for marketing purposes; and (4) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

53. By installing and implementing both Facebook and Google Tracking Technology, Defendant intentionally and proximately caused Plaintiff's and Class Members' PHI to be intercepted by and/or disclosed to Meta and Google.

C. **Underlying Web Technology Tracking Tools & Communications**

54. To understand Defendant's unlawful data-sharing and data misuse practices, it is important first to understand the basics of computer science and online communications.

55. Devices (such as computers, tablets, or smart phones) access web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

56. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

57. Every website is comprised of markup and source code. Markup is the forward facing portion of the website that the visitor sees and interacts with, such as images, links, forms, and more. By contrast, source code is essentially the invisible back-end portion of the website. The website user does not see what is happening within the source code during an ordinary website visit, but the source code acts as the set of instructions that commands the website visitor's browser and causes it to take certain actions when the web page first loads or when a specified event triggers the code. The source code is the mechanism that controls how a website user's browser communicates with the website's server communicate and vice versa.

58. As a user interacts with a website, multiple forms of web communications are occurring in the background between the user's browser and the website's server and include, but are not limited to:

- **HTTP Requests** are electronic communications sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests (e.g., request to access a page). POST Requests are requests to send data to the server (e.g., Form Submissions);

- **HTTP Responses** are electronic communications sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data;[8]

- **Uniform Resource Locators ("URL")** are web addresses that contain details of the HTTP Request and the user's specific search and browsing activities;

- **Cookies** are small text files that are set by the website the user is visiting and establish lines of communication between the user's browser and the website server. First Party Cookies are used to store information on the client device which can later be communicated to a server or servers such as user preferences (e.g., remember log in info). Users cannot detect or prevent transmissions through first-party cookies. Third-Party Cookies are set by a third-party domain such as Google and are used for targeted marketing purposes. Third-Party cookies can track the user across the web as the user searches and visits other websites.

59. A website owner, if motivated, can manipulate the HTTP Request process and allow third parties access to the user-server web communication. This interference is typically done through Tracking Technology with the intent to gather data from the user's website behavior for monetization and various marketing purposes.

60. Tracking Technology is implemented on a website by secretly embedding and configuring the tracking software into the Source Code. Once the Tracking Technology is implemented and configured in the Source Code, the Tracking Technology automatically intervenes and manipulates the HTTP web communication between the user's browser and the website server and instructs the website to send a duplicate transmission of the communication to unauthorized third-party servers, i.e., Google.

---

[8] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

61. Here, without its patients' consent, Defendant effectively used its Source Code to commandeer and "bug" or "tap" its patients' computing devices, allowing Google, Meta, and other third parties, to listen in on all of their communications with Defendant and thereby intercept those communications, including PHI.

**D. Defendant Collected & Disclosed Plaintiff's and Class Members' Private Information to Meta Through the Use of the Meta Pixel.**

62. Defendant implemented and configured at least one Meta Pixel in its Website Source Code with the intent to: (a) intervene and manipulate Plaintiff's and Class Members' HTTP request communications; and (b) to collect and share Plaintiff's and Class Members' behavioral data with Meta.

63. Defendant and Meta collected vast amounts of Private Information about Plaintiff and the Class Members through the Meta Pixel.

64. The Meta Pixel is a small (often invisible) piece of code that can be placed in the source code of a website, emails, or digital ads for data collection purposes. The Meta Pixel is a specific type of tracking pixel that connects a web user's browsing activity directly to the Meta advertising ecosystem (Facebook and Instagram). It offers highly valuable and effective integration between the data collected on a website with advertising campaigns through Meta platforms that include Meta Business Suites and Meta Ads Manager. The primary purpose of the Meta Pixel is to force a connection between the user's device and Meta's server, so that the Defendant can monitor, surveil, and collect user activity on its Website for marketing purposes.

65. Meta offers Tracking Tools to entities like Defendant as "free" software that advertisers can easily integrate into their webpages, mobile applications, and servers thereby

enabling the almost seamless implementation and configurations of pixels into the Source Code. In fact, however, access to the Meta tools are bartered in exchange for Defendant's patients' PHI.

66. By installing and implementing the Meta Pixel, Defendant caused Plaintiff's and Class Members' communications to be intercepted by and/or disclosed to Meta. As described above, once the Meta Pixel code is implemented in the Website source code, the pixel automatically intervenes with the web-user's browser and causes an unauthorized HTTPS Request and Response command to the user's browser forcing the user's browser to send Meta information about the user's visit on the Website and the user's identity.

67. The baseline configuration collected standard events including page views, links clicked, forms completed and submitted; timestamps of when the event occurred; and referrer data (showing which page led the user to the current one). Additional custom event tracking can be added by configuring additional code.

68. When Plaintiff and Class Members visited the Website, they would only see the Markup. Behind the scenes, however, the Meta Pixel software was embedded in the Source Code and was automatically transmitting what the patient did on the webpage and effectively opening a hidden spying window for Meta into the patients' browsing behavior.

69. As a direct result of implementation and configuration of the Meta Pixel, Defendant disclosed PHI to Meta in the forms of page views, button click tracking, form download tracking, and conversion tracking that related to the past, present and future medical care of Plaintiff and Class Members. Without discovery, Plaintiff is unable to know precisely the configuration utilized by Meta.

70. Each of these tracked and disclosed web communications are PHI because the tracked page views, clicks, and events each (1) related to the past, present and future medical care

of Plaintiff and Class Members, (2) confer and indicate that the user (Plaintiff and Class Member) was a patient or prospective patient at the time of the tracked web activity and (3), as discussed below, the behavioral data is identifiable with a specific user through the identifiers that were also disclosed to Meta at the same time.

71. Moreover, each of these web communications were disclosed without Plaintiff or Class Members express written consent and without a business associates agreement(s) between Defendant and Meta.

72. Each of these tracked and disclosed web communications are PHI because the tracked page views, clicks, downloads, and conversions each (1) related to the past, present and future medical care of Plaintiff and Class Members, (2) confirm and indicate that the user (Plaintiff and Class Member) was a patient or prospective patient at the time of the tracked web activity and (3), as discussed below, the behavioral data is identifiable with a specific user through the identifiers that were also disclosed to Meta at the same time.

**E. Plaintiff's and Class Members' Health Data were Reasonably Identifiable Through Meta Identifiers.**

73. With each web communication between Plaintiff and Class Members and the Website's server, persistent user identifiers were disclosed to Meta. These various identifiers would allow Meta to connect the specific patient with the activity as well as enable cross-platform tracking and audience creation based on the healthcare seeking behavioral data.

74. Meta used several digital identifiers: When the website user is logged into Facebook on their web browser or device, the website user's identity is revealed via Third-Party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's c_user

cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

75. A user's Facebook profile generally contains a wide range of demographic and other information about the user, including location, pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

76. The Meta Pixel also works in combination with persistent identifiers and fb_cookies (FID) or c_user cookies to connect the specific behavioral data on the Website to individuals, where it can be further used to build user profiles and enable cross-device tracking to surveil and collect data from individuals as they search and review other website content. Information sent to Facebook was sent alongside the Plaintiff's and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts and therefore their identity.

77. But the c_user cookie is not the only means by which Meta can identify a specific individual from the web communication.

78. When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

79. Regardless of whether a user is logged into a Facebook account, the fr cookie contains an encrypted Facebook ID and browser identifier. Facebook, at a minimum, uses the fr cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.

80. The cookies listed in the image above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Although Meta created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout its website.

81. Defendant, however, also revealed its website visitors' identities via more powerful first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and user who had interacted with Defendant's website.

82. Importantly, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike the fr cookies and c_user cookie, the _fbp cookie functions as a first-party cookie—i.e. a cookie that was created and placed on the website by Defendant.

83. In summation, Meta, at a minimum, uses both first-party and third-party cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

**F. Defendant Collected & Disclosed Plaintiff's and Class Members' Private Information to Google Through the Use of Google Tracking Tools.**

84. Google offers Tracking Tools to entities like Defendant for "free." However, access to the Google tools is also bartered in exchange for Defendant's patients' PHI. By implementing

and configuring Google Analytics, Defendant caused Plaintiff's and Class Members' communications to be intercepted by and/or disclosed to Google.

85. Defendant's Source Code implemented with Google Analytics (G-9MYK4SRPQS), Google Tag Manager (GTM-W88NV9P2), and Google Ads Conversion Tracking (AW-410841462) manipulated the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Google.

86. Google Analytics is marginally different than the Meta Pixel but essentially accomplishes the same goal; tracking what a user communicates to Defendant's website.[9] Google Analytics records the exact page and title; and Google Ads would fire three conversion trackers marking the user as a potential patient. These transmissions also occurred contemporaneously, invisibly, and without the patient's knowledge.

87. Several different methods allow marketers and third-parties to identify individual website users, but the examples below demonstrate what happens when the website user is logged into their Google account on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's CID, and allows Google to link the user's online communications and interactions to their individual Google Account.

88. Google receives at least five cookies when Defendant's website transmits information via their tracking tool:

[9] Amrita Singh, *Comparing Google Analytics vs Facebook Pixel*, Boltic (Nov. 17, 2022), https://www.boltic.io/blog/google-analytics-vs-facebook-pixel (last visited June 30, 2026).

| Name | Value | Do... | Path | Exp... | Size | Htt... | Se... | Sa... | Par... | Cro... | Pri... |
|---|---|---|---|---|---|---|---|---|---|---|---|
| __Secure-3PAPISID | LVQuNfAIDEqnmALR/A2Y-AAK... | .go... | / | 20... | 51 | | ✓ | None | | | High |
| __Secure-3PSID | g.a000_gjLu9iDxo7K_sMifUY2... | .go... | / | 20... | 167 | ✓ | ✓ | None | | | High |
| __Secure-3PSIDCC | AKEyXzVGe1okPUS-AHILxl3x... | .go... | / | 20... | 90 | ✓ | ✓ | None | | | High |
| __Secure-3PSIDTS | sidts-CjIBPWEu2RsImgPzoTBs... | .go... | / | 20... | 94 | ✓ | ✓ | None | | | High |
| NID | 533=BrsJaPRpAmjQfem1jSXS... | .go... | / | 20... | 757 | ✓ | ✓ | None | | | Me... |

*Figure 1. Screenshot from Defendant's network traffic report for Google Analytics list of cookies sent out.*

89. The NID cookie contains an encrypted Google Account ID and browser identifier. Google, at a minimum, uses the NID cookie to identify users, and this particular cookie can stay on a user's website browser for up to 6 months to identify the users history on the website.[10]

90. The cookies listed in the image above is commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Google. Although Google created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Google would not have received this data but for Defendant's implementation and use of the Pixel throughout its website.

91. Defendant also revealed its website visitors' identities via first-party cookies such as the _ga cookie that google uses to identify a particular browser and a user:[11]

| | | |
|---|---|---|
| _ga | GA1.1.1393304954.1782830010 | .centralohiourology.com |

*Figure 2. Screengrab from Defendant's network traffic report depicting the first party cookie _ga.*

Importantly, the _ga cookie is transmitted to Google even when the user's browser is configured to block third-party tracking cookies because, unlike the NID cookies and CID cookie, the _ga

---

[10] *Id.*

[11] *Id.*

cookie functions as a first-party cookie—i.e. a cookie that was created and placed on the website by Defendant.

92. In summation, Google at a minimum, uses the NID, _ga, and CID cookies to link website visitors' communications and online activity with their corresponding Google Accounts, and, because the tracking tools are automatically programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Google even when they have disabled third-party cookies within their web browsers.

93. As the user navigates the site, Google Analytics sends a special "file download" event to its servers containing: (1) exact file name "facesheet.pdf"; (2) the full URL to the medical form; (3) time on the page before downloading; and (4) assigns a permanent tracking ID linking the user to all previous visits.

94. As a direct result, Defendant disclosed confidential communications and PHI to Google in the forms of page views and events relating to the past, present and future medical care of Plaintiff and Class Members. Without discovery, Plaintiff is unable to know precisely the configuration in the Google Tag Manager Container or to determine precisely what form content and fields may also have been disclosed.

95. Each of these tracked and disclosed web communications are PHI because the tracked page views, clicks, and events each (1) related to the past, present and future medical care of Plaintiff and Class Members, (2) confer and indicate that the user (Plaintiff and Class Member) was a patient or prospective patient at the time of the tracked web activity and (3), as discussed below, the behavioral data is identifiable with a specific user through the identifiers that were also disclosed to Meta at the same time.

96. Each of these web communications were disclosed without Plaintiff's or Class Members' express written consent and without a HIPAA-compliant business associate agreement governing the transfer of data between Defendant and Google, Defendant and Meta, or any downstream parties.

97. Google collected vast quantities of Plaintiff's and Class Members' Private Information via the Tracking Tools installed on Defendant's Website.

**G. Google Identifiers**

98. Defendant and Google tracked each Plaintiff and Class Member who visited the Website through persistent identifiers associated with Universal Analytics and Google Ads.

99. Google, like Meta, uniformly stored a unique identifier in its logs for each Plaintiff and Class Member, whether in private browsing mode or non-private browsing mode. The unique identifier can then be used to connect the individual with the collected browsing activities on that Website. The value in the identifiers is that Google and Defendant can then use the identifiable behavioral data for serving personalized ads.[12]

100. Similarly, Google "stores users' logged-in identifier on non-Google websites…in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from and utilizes the user's browsing activities on that website.

---

[12] *See Brown*, 685 F. Supp. 3d, 909
2023 WL 5029899.) (denying summary judgment and citing internal evidence from Google employees). Google also connects user data to IP addresses, IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifying information. *See also Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, HHS, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited June 30, 2026) ("Such PHI may include, for example, an individual's IP address . . . .").

101. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads.[13] Google users who are logged-in to their Google accounts also have an identifier that is stored in Google's logs. Google logs a user's browsing activities on non-Google websites and uses these data for serving personalized ads.[14]

102. Google also tracks all users, whether logged into Google or not, with persistent IDs through Universal Analytics and Google Ad Words.

103. If the Plaintiff or Class Member was logged-in to their Google accounts while navigating the Website, Google's logs would include an additional identifier to further match an individual's browsing activities for additional tracking to serve personalized ads.[15]

104. As a direct result, Defendant disclosed confidential communications and PHI to Google in the forms of page views and events relating to the past, present and future medical care of Plaintiff and Class Members.

105. At a minimum, Defendant disclosed sufficient Private Information from which Google could infer Plaintiff's and Class Members' patient status.

106. Due to the vast network of information held by Google and its highly sophisticated algorithm, Google can easily and reliably match the IP addresses, device information, and the unique identifiers to connect an individual with the tracked browsing activity.

107. Google then utilizes such information to design and offer tailored marketing products such as Google Ad Words, which can be used for targeted advertising on those individuals.

---

[13] See *Brown* 685 F. Supp. 3d at 925 n.11 (explaining how Google tracks user data).

[14] *See id.* (quoting Google employee deposition testimony explaining how Google tracks user data).

[15] *Id.* (quoting Google employee deposition testimony explaining how Google tracks user data).

108. Defendant gained access to and utilized these powerful and valuable retargeting products in exchange for Plaintiff and Class Members Private Information

109. A user's Google ID ("GID"), a unique identifier similar to the c_user ID Facebook uses and described above, is also included and sent to Google identifying the user within Google's own system.

**E. Other Digital Identifiers (IP Address and Browser Fingerprinting)**

110. The baseline configurations on Meta and Google also collected and disclosed extensive amounts of additional user data that can be used to identify the specific user, including, but not limited to: user's IP address; type of device, operating system and browser details (browser fingerprinting).

111. On information and belief, through the use of the Tracking Tools on Defendant's Website, Defendant also disclosed and otherwise assisted third parties with intercepting Plaintiff's and Class Members' IP addresses.

112. An IP address is a number that identifies the address of a device connected to the Internet.

113. IP addresses are used to identify and route communications on the Internet.

114. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

115. Meta tracks every IP address ever associated with a Facebook user.

116. Additionally, Meta tracks IP addresses for use of targeting individual homes and their occupants with advertising.

117. As to Google, whenever a user visits a website that is running Google Analytics and Google Ad Manager, Google's software scripts on the website surreptitiously direct the user's

browser to send a secret, separate message to Google's servers in California, which includes the user's IP address, the user's geolocation, information contained in Google cookies, any user-ID issued by the website to the user, and information about the browser the user is using.

118. Defendant does not appear to have enabled the IP anonymization feature provided by Google Analytics because the text "aip:" does not appear in the image.

119. Accordingly, Google was also likely receiving patients' communications and PHI alongside the patients' IP address.

120. In addition to these personally identifiable persistent identifiers, upon receiving information from Defendant's Website, Google and Meta also utilize a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

121. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[16]

122. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

123. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they

[16] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndsssymposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

have installed to generate a unique identifier which can then be used to match a user across websites."[17]

124. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[18] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

125. Browser-fingerprints are personal identifiers. Google Analytics and other Google tracking tools can collect browser-fingerprints from website visitors.

126. Without discovery and full disclosure of the complete source code, Plaintiff cannot identify all browser fingerprint data at issue. However, review of the available code shows full browser/OS fingerprints, and screen/viewport sizes. Upon information and belief, additional data points were likely transmitted allowing for more accurate and identifiable browser fingerprinting.

**F. Web User's Journey on the Website**

127. To add additional detail to the allegations, the following paragraphs will walk through the process of what Plaintiff and Class Members would experience when utilizing the Website, as well as showing what was happening secretly in the Source Code surveilling their activity.

[17] Justin Schuh, *Building a more private web*, GOOGLE (Aug. 22, 2019), https://blog.google/products/chrome/building-a-more-private-web/.
[18] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY (Apr. 11, 2024), https://www.pixelprivacy.com/resources/browser-fingerprinting.

### 1. COUG Homepage

128. As patients enter the homepage of the site, they entered a secretive digital world that was surveilling each movement and each decision they made on the site, as reflected in the image below.




*Figure 3. Screenshot of network traffic taken from Defendant's website which shows that the Tracking Tools are actively installed and toed Tools tied firing on Defendant's Homepage.*

129. As depicted in Figure 3, immediately upon entering the homepage, Tracking Tools are firing to capture, *inter alia*, the user's visit and page views, so Defendant, Meta, Google can reissue targeted advertisements to that particular user.

### 2. Booking an Appointment

130. As a patient navigates the website, they can seek to "Book an Appointment" through the website. Before entering any information, the page itself contains both the Google and Meta Tracking Tools which are identifying the particular user.




*Figure 4. Screenshot of network traffic taken from Defendant's website, wherein the patient has clicked on the "Book Appointment" tab. The right side of the screenshot evidences that the Tracking Tools are installed, and the "Book Appointment tab' contains the unique identifiers for both Facebook and Google.*

131. Indeed, when the user goes to book an appointment on COUG's website, several cookies are firing, capturing the unique and confidential details of the user's doctor's appointments.




*Figure 5. Screenshot of network traffic taken from Defendant's while clicking on the "Book and Appointment," showing, once again that the Tracking Tools are installed.*

132. As this scenario plays out with thousands of users searching for and communicating about their medical care on Defendants website, the data collected from the Facebook Pixel and Google Tracking tools are then linked to both Google and Meta organization and monetization. Through these tools, Defendant had access to sophisticated data analytics reports that can be utilized for website optimization, profile building, and advertising campaign optimization.

133. The user is then directed to select a physician to continue the booking process. Upon clicking a specific physician, like Dr. Caputo in the below example, the patient's browser automatically sent an HTTP Request to Defendant's web server. Defendant's web server then automatically returned an HTTP Response, which loads the Markup for that particular webpage. The user only sees the markup, not Defendant's Source Code or underlying HTTP Requests and

Responses operating behind the curtain of the Website. Google is now informed that the patient is considering treatment with Dr. Caputo.




*Figure 6. The left side of Figure 6 is a screenshot from Defendant's website wherein the patient has clicked on Dr. Caputo's landing page. The right side of Figure 4 is a screenshot of network traffic taken from Defendant's website, which shows the live transmission of the patient's communications to Google wherein the click on Dr. Caputo's landing page.*

134. When reviewing the source code for Dr. Caputo's page, Defendant has several Google Tracking Tools and the Facebook Pixel enabled which let Defendant, Google and Meta know that the patient is interested in treating at this particular doctor.




*Figure 7. Screenshot from Defendant's website displaying that there are 9 cookies tagged to Dr. Caputo's webpage on COUG's website.*

135. Indeed, Figure 7 displays that Defendant is transmitting that the user has sought gynecological care from Dr. Caputo through 9 different cookies including those to both Meta ("fbp") and Google ("_ga").

136. Thus, without alerting the user, Defendant's Tracking Tools collected and sent the web communications the user made via the webpage to Meta and Google, and the images below confirm that the communications contain the user's Private Information.

### 3. Researching Treatments and Conditions

137. After visiting Dr. Caputo's webpage, the user can click links listed under her specialties. If the user navigates to the link for "Female Pelvic Health," COUG provides the user with certain information about treatments and conditions related to Female Pelvic Health, and more specifically Genitourinary Syndrome Menopause ("GSM").

138. If a user navigates to a page about a condition, like GSM, whatever they are viewing is communicated to Meta and Google. In the below example, the user visited the GSM page through Dr. Caputo's listed specialties, which caused the tracking pixels to fire.

139. Much like when the user selects a doctor as depicted above, when a user navigates to the treatment/condition page, the user's browser automatically sent an HTTP Request to Defendant's web server. Defendant's web server then automatically returned an HTTP Response, which loads the Markup for that particular webpage. Similarly, the user only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses operating behind the curtain of the Website. Meta and Google are now informed that the patient is seeking treatment for a Female Pelvic Health and/or GSM.




*Figure 8. The left side of the Figure Six 8 is a screenshot from Defendant's website wherein the patient the GSM page through Dr. Caputo's listed specialties. The right side of Figure 8 is a screenshot of network traffic taken from Defendant's website which display that the Tracking Tools simultaneously transmitted the above-mentioned communication to Meta and Google.*

140. Notably, this particular HTTPS request signals to Google precisely how the user landed on this treatment page – showing that the user first clicked physicians, then Dr. Caputo, then the GSM Page. The HTTPS request also contains additional tags that the user did not click such as the terms "vaginal," "menopause," "hormonal" and others.

### 4. Bill Pay Page

141. The user may also pay their medical bills directly on COUG's website. Unbeknownst to them, however, the Tracking Tools installed on COUG's website capture the user's payment activity.




*Figure 9. The left side is of Figure 9 is a Screenshot from Defendant's website the wherein a patient has clicked on the "Bill Pay" page. The right side of Figure 9 is a screenshot of network traffic Defendants website, wherein the patient has clicked on the "Bill Pay" page, thus displaying that the Tacking tools appear on the "Bill Pay" page.*

142. As depicted above the unauthorized transmission of the patients' interactions with Defendant's website is highly offensive to the reasonable person, as their browsing history is

directly linked to their confidential PHI, and that browsing history is undoubtedly being shared with Meta and Google.

### G. The Disclosure of Private Health Information to Google and Meta Violated HIPAA Regulations.

143. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

144. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

145. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[19]

---

[19] HHS.gov, HIPAA For Professionals (last visited April 12, 2023), https://www.hhs.gov/hipaa/forprofessionals/privacy/index.html.

146. The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

147. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

148. Under the HIPAA de-identification rule, in order to adequately de-identify a data set relating to health care services, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

a. Names;

***

H. Medical record numbers;

***

J. Account numbers;

***

M. Device identifiers and serial numbers;

N. Web Universal Resource Locators (URLs);

O. Internet Protocol (IP) address numbers; … and

R. Any other unique identifying number, characteristic, or code…;and"

The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514(b)(2).

149. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[20]

150. In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, *the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing*. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not*

[20] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance With the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS (Nov. 26, 2012), available at https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

> *sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[21]

151. Here, Defendant effectively traded its patient list for access to these valuable marketing tools. And neither Plaintiff nor any Class Member provided express written consent for the use of their PHI for marketing purposes.

152. While there was not a direct sale of the patient list, by disclosing the patient status of all the users of the Website in exchange for valuable marketing tools, Defendant engaged in a bartered commercial transaction whereby its patient list was constructively and effectively sold to the world's largest marketing companies.

153. The Tracking Tools allow advertisers to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.

154. Defendant utilized the Tracking Tools on numerous sensitive pages of its Website with the intent to share and disclose Plaintiff's and Class Members' confidential web communications and behavioral data with Google and Meta.

155. Whether intentional, reckless, or negligent, the data shared with Meta and Google was PHI.

156. Upon information and belief, Defendant utilized the Tracking Tools and shared PHI with Meta and Google with the intent to maximize its marketing return on investment.

157. Upon information and belief, Defendant accessed and utilized Meta Business Suites and Ads Manager Reports to review and utilize the Meta Pixel data to refine and design its advertising strategies. These strategies were intended to monetize Plaintiff's and Class Members'

---

[21] *OCR HIPAA Privacy: Marketing*, HHS (Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

data and included one or more of the following: website analytics, advertising optimization, conversion tracking, and/or email marketing.

**H. Meta Ads and Business Suites**

158. The Meta Pixel does not work in isolation but connects a web user's browsing activity directly to the powerful Meta advertising ecosystem (Facebook and Instagram). It offers highly valuable and effective integration between the data collected on a website with advertising campaigns through Meta platforms that include Meta Business Suites and Meta Ads Manager.

159. After intercepting and collecting the Private Information, Meta processes the data, analyzes it, segments and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Meta will associate the collected information with a Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

160. In addition to the Website analytics, Meta Pixel creates value for the Defendant by providing Defendant with access to sophisticated algorithms and computer learning (AI) tools that allow Defendant to further utilize Plaintiff's and Class Members' behavioral data on the website to build highly targeted audiences. These audiences include both custom audiences and lookalike audiences.

161. A "custom audience" is used to re-target users who have previously visited a website or taken specific actions on the website. For example, if a user visited Defendant's Website and didn't request an appointment, a custom audience could be built from the data gathered from the Meta Pixel to retarget those users with specific ads to try to get them to come back to the Website to schedule an appointment.

162. A "lookalike audience" is designed with the goal of reaching new potential customers who share similar characteristics, behaviors, and demographics as the existing high value customers tracked by the Meta Pixel. In this scenario, if Defendant wanted to target potential patients for urological medical treatment, it could analyze, segment and use the data collected from patients who completed "book an appointment forms" for urological medical treatment to build a lookalike audience. That audience would then be used in combination with Meta's vast ecosystem and advertising platform to get ads in front of individuals with the same or similar profiles as the current urological medical treatment patients of Defendant.

163. The Meta Pixel further provides real-time data to Meta's algorithms, allowing for automatic optimization of ad delivery. Meta's systems use the data provided from the Meta Pixel to learn and predict which users are more likely to convert and complete a request for appointment and will automatically target those potential patients to maximize the ad spend. In other words, the powerful Meta algorithm that has been gathering data from all aspects of the internet incorporates the patient data from the Website to place digital advertisements in front of audiences with the greatest chance of becoming a new patient of Defendant. The per patient conversion cost is then expected to be far lower than if Defendant attempted to use less sophisticated and targeted forms of advertising like traditional media, where the ad impression cost is much higher and the cost to convert a patient is higher.

164. Defendant is in exclusive control over whether CAPI was implemented. But the availability of the Tool shows notice of the privacy concerns when utilizing the Meta Pixel. Moreover, while Defendant is in exclusive control of any audience marketing campaigns it built and utilized, the presence of targeted Facebook advertisements online indicates that Defendant was utilizing Meta Business tools to create audiences and monetize Plaintiff's and Class Members' browsing activity and Private Information collected from the Website.

165. At a minimum, Defendant disclosed sufficient Private Information from which Meta could infer Plaintiff's and Class Members' patient status.

**I. Defendant's Marketing Practices Violated HIPAA Standards**

166. While Plaintiff does not assert a private right of action under HIPAA, the intentional violations of the statutory duties and standards under HIPAA constitute criminal and civil acts subject to penalties imposed by 42 U.S.C. § 1320d-6. Here, Defendant knowingly implemented Tracking Tools with the intent of collecting and disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b).

167. The primary motivation and a determining factor in Defendant's collection, interception, and disclosure of Plaintiff's and Class Members' Private Information was the use of patient data for advertising in the absence of express written consent. Such conduct gives rise to a violation of HIPAA.

168. Moreover, there is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains

individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

**J. Defendant's Marketing Conduct Also Violated Ohio Law**

169. Defendant operates and provides medical services in the state of Ohio and is subject to Ohio laws for the Ohio patients it treats. Ohio courts have long recognized that health care providers like Defendant owe a duty of confidentiality to patients, which prohibits them from disclosing patients' health information without patients' written consent. *Biddle v. Warren General Hospital*, 86 Ohio St.3d 395, 401 (1999).

170. Ohio has made its laws governing the use and disclosure of protected health information consistent with HIPAA. *See* R.C. 3798.01, *et seq.* Ohio law adopts the same definitions of "covered entity," "disclosure," "health care provider," "health information," "protected health information," "individually identifiable health information," and "use" as provided by the HIPAA Privacy Rule. *See* R.C. 3798.01.

171. Defendant is a "covered entity" within the meaning of R.C. 3798.01.

172. Under R.C. 3798.03(A)(2), a covered entity shall "Implement and maintain appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information in a manner consistent with 45 C.F.R. 164.530(c)."

173. Under R.C. 3798.04, a covered entity shall not do either of the following:

> (A) Use or disclose protected health information without an authorization that is valid under 45 C.F.R. 164.508 and, if applicable, 42 C.F.R. part 2, except when the use or disclosure is required or permitted without such authorization by Subchapter C of Subtitle A of Title 45 of the Code of Federal Regulations and, if applicable, 42 C.F.R. part 2;
>
> (B) Use or disclose protected health information in a manner that is not consistent with 45 C.F.R. 164.502.

174. Under this statute and the federal standards it incorporates, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's express written authorization, nor sell such information without disclosing that the disclosure will involve remuneration to the provider.[22]

**K. Defendant Was Enriched and Benefitted from the Use of The Tracking Tools and Unauthorized Disclosures to Google and Meta.**

175. Defendant's further use of Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.

176. In exchange for disclosing Private Information of its patients, Defendant was enriched and enhanced by advertising services and more cost-efficient marketing on its platform.

177. Upon information and belief, Defendant utilized Plaintiff's and Class Members' data that was collected through Meta and Google marketing tools to implement one or more of the following marketing tactics: website optimization, audience building, and targeted campaigns, all designed to target current and potential patients to drive more profit. Defendant directly benefited through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

178. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby

[22] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

benefitting Defendant while invading the privacy of Plaintiff and Class Members and violating their rights under federal and Ohio law.

**L. Plaintiff's and Class Members' Private Information Had Financial Value**

179. Plaintiff's data and Private Information has economic value in established marketplaces. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients. Google has recognized the value of user data and has even instituted a pilot program in which it pays users $3 per week to track them online.

180. Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, internet companies earned $202 per American user from mining and selling data. That figure is only expected to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

181. The value of health data, including patient lists in particular, is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[23]

---

[23] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME.COM (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ (last visited June 30, 2026).

182. Moreover, healthcare systems commonly value the lifetime value of a patient and the value of a marketing lead and impression, as well as the value of the conversion of a new patient.

183. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[24]

184. Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[25]

185. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

---

[24] *See* Christina Farr, *Hospital Execs Say They Are Getting Flooded With Requests For Your health Data*, CNBC, https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited July, 20, 2026).

[25] VERO, *How to Collect Emails Addresses on Twitter* https://www.getvero.com/resources/twitter-lead-generation-cards/. (last visited June 30, 2026).

186. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

187. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

188. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[26]

189. Data brokers obtain large volumes of consumer information without consumer knowledge to resell the data for marketing campaigns. The FTC has investigated the practices and found that "data brokers collect and store billions of data elements covering nearly every U.S. consumer."[27]

190. Data brokers combine online and offline data to market to consumers online. Data brokers combine and analyze data about consumers to make inferences about them, including sensitive inferences related to health conditions. Some data brokers have been found to store data indefinitely posing significant privacy risks.[28]

---

[26] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.
[27] *FTC Recommends Congress Require the Data Broker Industry to be More Transparent and Give Consumers Greater Control Over Their Personal Information*, FTC (May 27, 2014), https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-recommends-congress-require-data-broker-industry-be-more-transparent-give-consumers-greater.
[28] *Id.*

191. Data brokers do not obtain the data directly from consumers, rather they obtain it through various sources including partnerships with third party marketers that utilize tracking tools. While each data broker source may provide only a few data elements about a consumer's activities a data broker can combine the data sets to form a more detailed profile of the consumer's life.

192. In fact, the unauthorized data collection from third party trackers, tags, and pixels has resulted in a proliferation and expansion of the data broker ecosystem. The web trackers serve as pivotal components in the data broker ecosystem by facilitating the collection of online activities, preferences, and demographics. This aggregated data is then analyzed and sold to various entities interested in understanding consumer behavior and targeting specific demographics.[29]

193. The U.S. data broker market is projected to grow from $280.82 billion in 2023 to $382.16 billion in 2030. This expansion is largely driven through the data harvested from the pixels and trackers on the website.

194. As far as medical advertising, the data brokers routinely utilize the data sets to predict which consumers are most likely to use, e.g., brand name medicine, order prescriptions by mail, research medications online, or respond to pharmaceutical ads or other treatment advertisements. These predictive models are then sold and used for targeted advertising.

195. The lack of transparency in the data brokering ecosystem makes it unknown whether Meta and/or Google sold or traded any of the data they received through the Tracking Technology at issue.

[29] https://lokker.com/api/directus-assets/419fdf43-83ba-4dba-9821-d8eff94f956a (last visited July 21, 2026)

196. However, it is indisputable that the data at issue given its medical data is highly valuable for segmentation and profile building.

197. Once the data is shared and disclosed to any of the Unauthorized Third-Party Marketers, the patients, Class Members, and Defendant lose control over its usage and distribution.

**M. Plaintiff and Class Members' Common Experience**

198. Plaintiff and Class Members are Defendant's patients who reside in Ohio and received healthcare services from Defendant. As part of the medical services, Plaintiff and Class Members used Defendant's Website to communicate Private Information to Defendant on numerous occasions. At all times, while using the Website, Plaintiff and Class Members had an expectation of privacy that the Private Information provided to Defendant would remain private and confidential.

199. Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

200. Plaintiff and Class Members were not aware that their Private Information would be disclosed to the Unauthorized Third Parties and that Defendant was utilizing their Private Information for marketing purposes because Defendant did not acquire their consent.

201. Plaintiff and Class Members were Facebook and/or Google users.

202. As Plaintiff and Class Members used Defendant's Website, the Website's Source Code configured with Tracking Tools sent a secret set of instructions back to the Plaintiff's and Class Members' browsers, causing the Tracking Tools to uniformly send Plaintiff's and Class Members' Private Information to the Unauthorized Third Parties.

203. Accordingly, during the same transmissions, the Website routinely provided the Unauthorized Third-Party Marketers with digital identifiers allowing the Third Parties to connect the Plaintiff and Class Members with their Private Information.

204. Furthermore, following the disclosure, Plaintiff's and Class Members' Private Information was aggregated and analyzed through the Unauthorized Third-Party Marketers analytics tools and reports. From there, the aggregated data could be segmented and linked to specific user profiles for use in building "custom" and "lookalike audiences" and was incorporated into the Unauthorized Third-Party Marketers algorithms for other avenues of re-targeting.

205. Once released to the digital marketing ecosystem, the collected data may also be shared or combined with data broker aggregated data and profiles for additional marketing reach.

206. Upon information and belief, Defendant monetized Plaintiff and Class Members Private Information by building custom and lookalike audiences to target and re-target patients and potential patients. By utilizing the Unauthorized Third-Party Marketer's tools, Defendant was able to save substantial marketing costs while decreasing its cost per conversion, as well as likely increasing its overall new patient conversion.

207. Without discovery, Plaintiff and Class Members are unable to know the full extent of the improper disclosure and use of their Private Information.

**N. Plaintiff S.P.'s Representative Experience**

208. Plaintiff S.P. is a current patient of Defendant and has paid for and received treatment from Defendant within the last couple of months.

209. Throughout her patient relationship with Defendant, Plaintiff accessed and utilized Defendant's Website via her smartphone and Safari browser as part of her medical care provided by Defendant.

210. More specifically, Plaintiff used the Website to complete the following tasks: (1) schedule appointments, (2) fill out patient forms, (3) log into the patient portal, (4) request information, (5) review services and look up particular doctors, and (6) review pages dedicated to her symptoms.

211. In doing so, she communicated her PHI, including her name, email, phone number, date of birth, insurance information, medical information, and appointment requests, along with the fact that she was seeking and received medical treatment for urological conditions.

212. As a result of using the Website in the manner described above, and pursuant to the systematic process described herein, unauthorized third parties obtained Plaintiff's Private Information. The specific information Meta and Google received included, at a minimum, the fact that she was a medical patient seeking and receiving medical treatment from Defendant. Based on the type of treatment sought and the URLs transmitted, both Facebook and Google likely could infer specific medical diagnosis as well.

213. Plaintiff has a Gmail account that she accesses through her smartphone, which she used to access Defendant's Website.

214. Pursuant to the systematic process described herein, Plaintiff's Private Information was disclosed to Meta and Google, and this data included her PII, PHI, and related confidential information. Specifically, Plaintiff communicated her name, date of birth, phone number, email address, insurance information, medical history, and appointment requests through Defendant's website. Defendant intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

215. As Defendant's patient, Plaintiff reasonably expected that her online communications with Defendant were solely between herself and Defendant and that such communications would not be transmitted or intercepted by a third party. Plaintiff also relied on Defendant's Privacy Policies in reasonably expecting Defendant would safeguard her Private Information. But for her status as Defendant's patient and Defendant's Privacy Policies, Plaintiff would not have disclosed her Private Information to Defendant.

216. During her time as a patient, Plaintiff never consented to the use of her Private Information by third parties or to Defendant enabling third parties, including Meta Facebook and Google, to receive, access or interpret such information for marketing or any other purpose.

217. Notwithstanding, through the Tracking Tools, Defendant transmitted Plaintiff's Private Information to third parties, such as Meta and Google.

218. After using Defendant's Website, Plaintiff saw targeted advertisements on Google related to her website usage.

219. The disclosure of Plaintiff's sensitive healthcare information, particularly information that she otherwise kept private, has caused Plaintiff significant injury. This wanton disclosure of such personal information would be highly offensive to the typical person, as it is to Plaintiff.

**O. Class Wide Injuries, Damages, and Remedies**

220. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of fiduciary duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the

ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

221. Consequently, Plaintiff individually and on behalf of the putative Class, brings this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiff and the putative Class have suffered significant damages and seek the following remedies:

a. Compensatory damages;

b. Loss of benefit of the bargain;

c. Conversion (FMV value of the use of the data for marketing);

d. Statutory damages;

e. Nominal damages, in the alternative;

f. Consequential and future damages for reasonable and necessary data monitoring services including data broker and dark web monitoring, as well as the cost of removing the disclosed data and profiles from data broker networks;

g. Restitution for the FMV of the misuse of the Private Information;

h. Disgorgement of profits or cost savings derived from misuse of Plaintiff's and Class Members' Private Information;

i. Injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

222. The injunctive relief sought includes:

a. Removal of the Tracking Tools from sensitive parts of the Website;

b. Deletion of all analytics data collected through the Tracking Tools that includes Private Information;

c. Deletion of all audience profiles and campaigns built from data gathered through the Tracking Tools and from Plaintiff's and Class Members' Private Information;;

d. Deletion of Plaintiff's and Class Member data from all identifiable third-party broker lists;

e. Enjoining Defendant from utilizing any of the Tracking Tools at issue in this matter in the future on any sensitive Website pages.

f. Enjoining Defendant from utilizing any other Tracking Technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with third parties.

g. Other relief as ordered by the Court.

## TOLLING

223. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her PII and PHI was intercepted and unlawfully disclosed to Meta and Google because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

224. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Ohio Rules of Civil Procedure.

225. Class Definition: Plaintiff brings this action on behalf of herself and other similarly situated individuals defined as follows:

> **Ohio Class:** All individuals residing in Ohio who used Defendant's Website and had their Protected Health Information disclosed to Meta and Google.

226. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

227. Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

228. Numerosity, Civ.R. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Facebook and Google and the Class is identifiable within Defendant's records.

229. Commonality, Civ.R. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties, such as but limited Google and Meta;

d. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been divulged;

e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

g. Whether Defendant's conduct violated the Ohio statutes identified herein.

h. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

230. Typicality, Civ.R. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Tracking Tools due to Defendant's misfeasance.

231. Adequacy, Civ.R. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights, and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

232. Superiority and Manageability, Civ.R. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged

herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

233. Policies Generally Applicable to the Class. Civ.R. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

234. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member

to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

235. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members (which can be obtained from Defendant's records) demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

236. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

237. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Class Action Complaint.

238. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Ohio Rules of Civil Procedure.

239. Issue Certification, Civ.R. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**INVASION OF PRIVACY- Intrusion Upon Seclusion**
**(*On behalf of Plaintiff and the Class*)**

240. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

241. The Private Information of Plaintiff and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

242. Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

243. Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

244. Defendant's unauthorized disclosure of Plaintiff's and Class Members' Private Information to Meta and Google is highly offensive to a reasonable person.

245. Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Private Information constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

246. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant facilitated Meta and Google's simultaneous eavesdropping and wiretapping of confidential communications.

247. Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it installed the Tracking Tools onto its Website because the purpose of the Tracking Tools is to track and disseminate individuals' communications with the Website for the purpose of marketing and advertising.

248. Because Defendant intentionally and willfully incorporated the Tracking Tools into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

249. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiff and the Class Members were disclosed to a third party without authorization, causing Plaintiff and the Class to suffer damages.

250. Plaintiff, on behalf of herself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

251. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of Meta and Google and the wrongful disclosure of the information cannot be undone.

252. Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook, which upon information and belief, continues to possess and utilize that information.

253. Plaintiff, on behalf of herself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
***(On behalf of Plaintiff and the Class)***

254. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

255. Pursuant to Ohio Civ. R. 8(E)(2), Plaintiffs plead this claim in the alternative to breach of confidence (*Biddle*).

256. Medical providers, like Defendant have a duty of confidentiality to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

257. As a fiduciary of the Private Information and medical provider, Defendant further owed Plaintiff and Class Members a duty of loyalty that precluded the misuse and misappropriation of Plaintiff's and Class Members' Private Information.

258. In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; and (2) to only use the information for the authorized purpose.

259. Plaintiff and Class Members had reasonable expectations of privacy in their Private Information and the related confidential communications exchanged with Defendant through the Website.

260. Plaintiff and Class Members also reasonably expected that their Private Information would only be utilized for medical purposes.

261. Plaintiff and Class Members did not provide consent for Defendant to appropriate or use their Private Information for commercial and digital marketing purposes.

262. Contrary to its duties as a fiduciary and medical provider and its express and implied promises of confidentiality, Defendant installed Tracking Tools with the intent and purpose to disclose and transmit Plaintiff's and Class Members' Private Information to Google and Meta.

263. The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by Defendant's employees acting within the scope of their employment with the purpose of marketing for new patients. Alternatively, the disclosures of

Plaintiff's and Class Members' Private Information occurred because of Defendant's negligent hiring or supervision of its employees, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees to properly discharge their duties under existing privacy policies and procedures.

264. Defendant's breach of fiduciary duty is evidenced by its failure to comply with federal and state privacy regulations, including:

a. Failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c. Failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d. Failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiff's and Class Members' PHI;

e. By failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communication in violation of 45 C.F.R. § 164.312(e)(1).

f. Failing to hire an expert to review the risk of data sets for re-identification and further failing to remove all digital identifiers from the data sets before disclosing the Private Information in violation of 45 C.F.R. § 160.103.

g. Failing to effectively train all members of its workforce, namely its digital marketing department and regulatory department on the policies and procedures with respect to PHI as necessary and appropriate for the members of its staff to carry out their responsibilities to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

h. By impermissibly and improperly disclosing Private information that is and remains accessible to unauthorized versions in violation of 45 C.F.R. § 164.502, *et. seq.*, 45 CFR§ 164.508, *et. seq.*, and R.C. 3798.04, *et seq.*

i. By failing to comply with R.C. 3798.04, *et seq.*, regarding the use and the disclosure of protected health information.

j. By otherwise failing to safeguard Plaintiff's and Class Members' Private Information;

k. By otherwise misusing and unjustly profiting from Plaintiff's and Class Members' Private Information.

265. As a direct and proximate result of COUG's breach of fiduciary duty and confidentiality, Plaintiff and Class Members have suffered numerous harms and injuries, including invasion of privacy, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

266. Consequently, Plaintiff individually and on behalf of the putative Class, seeks the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and in the alternative, nominal damages. Plaintiff further seeks restitution, disgorgement of profits or cost savings obtained from the improper use of the Private

Case: 2:26-cv-01187-DRC-CMV Doc #: 6 Filed: 10/02/26 Page: 73 of 101 PAGEID #: 299

Information. Finally, Plaintiff seeks injunctive relief to address the ongoing breach of the fiduciary duty and financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

## COUNT III
## BREACH OF IMPLIED CONTRACT
***(On behalf of Plaintiff and the Class)***

267. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

268. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiff and the Class Members provided their Private Information.

269. When Plaintiff and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information or use it for non-medical purposes without consent.

270. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to maintain the confidentiality and limited scope of use.

271. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to the Unauthorized Third-Party Marketers without consent.

272. Defendant further breached the implied contracts by using Plaintiff's and Class Members' Private Information without consent.

273. As a direct and proximate result of Defendant's breach of these implied contracts, Plaintiff and Class Members sustained numerous injuries including but not limited to the loss of the benefit of their bargain, invasion of privacy, loss of control of their Private Information,

misappropriation and misuse of their Private Information, breach of confidentiality, conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

274. Consequently, Plaintiff, individually and on behalf of the putative Class seeks legal and equitable remedies to address and rectify the breach of implied contract described herein including compensatory and consequential damages, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and, in the alternative, nominal damages. Plaintiff further seeks restitution, and disgorgement of profits or cost savings obtained from breach and the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

**COUNT IV**
**UNJUST ENRICHMENT**
***(On behalf of Plaintiff and the Class)***

275. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

276. Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

277. Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

278. Defendant exceeded any authorization given and instead consciously disclosed, misappropriated, and misused the Private Information for marketing and its own gain, providing

Defendant with economic, intangible, and other benefits, including substantial monetary savings and revenue.

279. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members for the use of the Private Information.

280. The financial benefits that Defendant derived from Plaintiff and Class Members were not offered by Plaintiff and Class Members gratuitously and rightly belong to Plaintiff and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the savings, profit or other financial benefits wrongly derived from the misappropriation and misuse of Plaintiff's and Class Members' Private Information as alleged in this Complaint.

281. Consequently, due to the unjust nature of Defendant's actions and the injuries and damages sustained by Plaintiff and the Class, Defendant should be compelled to disgorge into a common fund all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper. These equitable funds can be evenly allocated among the Plaintiff and Class Members on a pro-rata basis.

282. Alternatively, Defendant should be compelled to provide restitution to Plaintiff and Class for the fair market value of the Private Information that Defendant misappropriated and misused for marketing purposes without consent.

283. Furthermore, Plaintiff seeks injunctive relief to prevent the imminent financial and privacy harms arising from the ongoing disclosure, interception, and misuse of Plaintiff's and Class Members' Private Information.

## COUNT V
## INTERCEPTION AND DISCLOSURE OF ELECTRONIC COMMUNICATIONS IN VIOLATION OF OHIO R.C. 2933.51
*(On behalf of Plaintiff and the Ohio Class)*

284. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

285. Plaintiff brings this claim on behalf of herself and all members of the Class.

286. Defendant qualifies as a person under the statute.

287. R.C. 2933.52(B)(4) provides that it is unlawful for a person not acting under law to intercept an electronic communication "for the purpose of committing a criminal offense or tortious act in violation of the laws or Constitution of the United States or this state for the purpose of committing any other injurious act."

288. Defendant intercepted Plaintiff's and Class Members' electronic communications for the purpose of committing multiple tortious and criminal acts, including, but not limited to, the violations of statutes, regulations, and common law identified above.

289. For example, Defendant intercepted Plaintiff's and Class Members' electronic communications for the purpose of disclosing those communications to Facebook without the knowledge, consent, or written authorization of Plaintiffs or Class Members. The disclosure of Plaintiff's and Class Members' Personal Health Information to Facebook without consent or proper authorization is an illegal or tortious act that violates multiple laws, including (but not limited to) 42 U.S.C. § 1320d-6, 15 U.S.C. 45, R.C. 3798.04, R.C. 3798.03(2), 45 CFR § 164.508(a)(1), R.C. 1345.02(A), R.C. 1345.03(A), and R.C. 1347.05(g). Defendant's misconduct accordingly falls within the ambit of Ohio's wiretapping statute.

290. Furthermore, as set below, Defendant's interception of Plaintiff's and Class Members' electronic communications for the purpose of disclosing their Private Information to Facebook is also a tortious act that constitutes a breach of the fiduciary duty of confidentiality owed by doctors and hospital systems to their patients as set forth by the Ohio Supreme Court in *Biddle v. Warren General Hospital*, 86 Ohio St. 3d 395, 401

291. Any person whose wire, oral, or electronic communications are intercepted, disclosed, or intentionally used in violation of the Wiretap Act may bring a civil action to recover from the person or entity that engaged in the violation. R.C. 2933.65.

292. Defendant violated the Ohio Wiretap Act by intercepting Plaintiff's and Class Members' electronic communications in violation of R.C. 2933.52(A)(1).

293. Defendant separately violated the Ohio Wiretap Act by using the contents of a Plaintiff's and Class Members' electronic communications, knowing or having reason to know, that the contents were obtained through the interception of an electronic communication in violation of R.C. 2933.52(A)(3). Specifically, Defendant knowingly used the contents of Plaintiff's and Class Members' electronic communications to barter and/or sell that information to third parties like Meta and Google in return for access to the Tracking Tools.

294. Defendant qualifies as a person under the statute.

295. Ohio law defines "electronic communications" to mean "the transfer of a sign, signal, writing, image, sound, datum, or intelligence of any nature that is transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo-optical system." R.C. 2933.51(N). Plaintiff's and Class Members' communications with Defendant constitute "electronic communications" under Ohio law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications

in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

296. Defendant engaged in and continues to engage in interception by aiding others (including Facebook and Google) to secretly record and disclose the contents of Plaintiff's and Class Members' electronic communications.

297. The intercepting devices used in this case include, but are not limited to:

a. Plaintiff's and Class Members' personal computing devices;

b. Plaintiff's and Class Members' web browsers;

c. Plaintiff's and Class Members' browser-managed files;

d. The Tracking Tools;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

h. Computer servers of third parties (including Meta and Google) to which Plaintiff's and Class Members' communications were disclosed.

298. "Contents" under the Act, when used with respect to any electronic communication, includes "any information concerning the substance, purport, or meaning of the communication." R.C. 2933.51(G).

299. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

300. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. PII such as patients' IP addresses, Meta IDs, Google IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about locations and physicians/therapists they treated with;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's Website(s);

k. The precise dates and times when patients visit Defendant's Websites;

l. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

301. Plaintiff and Class Members reasonably expected that their Private Information was not being intercepted, recorded, and disclosed to Google, Meta and /or other third-party advertising companies.

302. No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Private Information to Google and Meta and similar third-party advertising companies. Neither Plaintiff nor Class Members consented to the disclosure of their Private Information by Defendant to these third parties. Nor could they have consented, given that Defendant never sought Plaintiff's or Class Members' consent, or even told visitors to its website that their every interaction was being recorded and transmitted to Facebook and other third parties via Tracking Tools so that these third parties could monetize their Private Information.

303. Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their PHI to develop marketing and advertising strategies.

304. Under the Wiretapping Act, all aggrieved persons are entitled to recover actual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of the violation or ten thousand dollars ($10,000.00), whichever is greater, punitive damages, and reasonable attorney's fees and other litigation costs. R.C. 2933.65.

305. Plaintiff and Class Members have, and will continue to, suffer irreparable injury from Defendant's unauthorized acts of disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Defendant and Meta, Google, and other third parties without their consent and has not been destroyed. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiff continues to desire to search for health information on Defendant's website.

306. Plaintiff will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiff would use Defendant's website to search for health information in the future. Due to the continuing threat of injury, Plaintiff and Class Members have no adequate remedy at law, and Plaintiff and Class Members are therefore entitled to injunctive relief.

307. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT VI
## BREACH OF CONFIDENCE
## *(Biddle Claim)*
## *(On Behalf of Plaintiff and the Ohio Class)*

308. Plaintiff incorporates all prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

309. Medical providers in Ohio have a duty to their patients to keep Private Information confidential and to not disclose Private Information to third parties without the patient's informed consent or other applicable legal privilege entitling them to do so.

310. Plaintiff and Class Members had reasonable expectations of privacy when interacting with Defendant through the Website, including communications made on the Website, in virtue of this well-known duty of confidentiality incumbent upon medical providers.

311. Contrary to its duty as a medical provider, Defendant deployed the Tracking Tools to secretly record and transmit nonpublic Private Information to third parties as described throughout this Class Action Complaint without patient authorization or consent.

312. The Private Information that Defendant transmitted to third parties without authorization was learned within a physician-patient relationship.

313. Defendant's breaches of confidence were committed negligently, recklessly, and/or intentionally.

314. Defendant's breaches of confidence were a direct and proximate cause of several injuries suffered by Plaintiff and Class Members, including, but not limited to, losses of privacy, interference with confidential relationships, and diminished value of Private Information. Plaintiff and Class Members seek compensatory damages in an amount to be proved at trial. In the alternative, Plaintiff and Class Members seek nominal damages.

**COUNT VII**
**CIVIL LIABILITY FOR CRIMINAL ACTIONS**
**(R.C. 2307.60, et seq.)**
***(On behalf of Plaintiff and Ohio Class Members)***

315. Plaintiff incorporates the prior allegations as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

316. Defendant's conduct as described throughout this Complaint violated 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly "disclosing individually identifiable health information" ("IIHI") to a third party.

317. 42 U.S.C. § 1320d(6) defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

318. Defendant intentionally used the Tracking Tools to transmit IIHI to unauthorized third parties for commercial purposes without Plaintiff's and Class Members' knowledge or

consent. Plaintiff's and Class Members' IIHI was then used by third parties to target Plaintiff and Class Members with particular advertising associated with their particular health conditions.

319. As described above, Defendant obtained a commercial benefit from its transmission of the IIHI. In other words, Defendant intended to sell, transfer, or use Plaintiff's and Class Members' IIHI for personal gain.

320. This conduct was unknown to Plaintiff and Class Members, who lack direct access to what occurs in the background of Defendant's Website.

321. Plaintiff and Class Members have been injured by Defendant's criminal violations of 42 U.S.C. § 1320d-6(a)(3).

**COUNT VIII**
**NEGLIGENCE**
**(On behalf of Plaintiff and Class Members)**

319. Plaintiff incorporates the prior allegations and if fully set forth herein and brings this count individually and on beyond the proposed class.

320. Pursuant to Ohio Civ. R. 8(E)(2), Plaintiffs plead this claim in the alternative to breach of confidence (*Biddle*).

321. Defendant owed Plaintiff and Class Members a Duty to keep their private information completely, confidential and to safeguard sensitive personal and medical information.

322. Plaintiff and class members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's website

323. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties

Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

324. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

325. The third-party recipients included, but may not be limited to, Meta and/or Google.

326. As direct and proximate cause of Defendant's unauthorized disclosure of patient, personally identifiable, non-public medical information, and communications. Plaintiff and Class members were by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;
b. Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;
c. Defendant eroded the essential confidential nature of the provider-patient relationship;
d. General damages for invasion of their rights in an amount to be determined by a Jury;
e. Nominal damages for each independent violation;
f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;
g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B. For an award of damages, including, but not limited to, past and future compensatory, actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

C. For equitable relief in the form of restitution and disgorgement of profits;

D. For injunctive relief requested by Plaintiff, including, but not limited to:

i. Removal of the Tracking Tools from sensitive parts of the Website;

ii. Deletion of all analytics data collected through the Tracking Tools;

iii. Deletion of all audience profiles and campaigns built utilizing data gathered from the Tracking Tools;

iv. Deletion of Plaintiff's and Class Member data from all identifiable third-party broker lists;

v. Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future.

vi. Enjoinment from utilizing any other Tracking Technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with the third parties.

vii. Other injunctive relief as ordered by the Court.

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands that this matter be tried before a jury.

DATE: July 24, 2026

Respectfully Submitted,

*/s/ Arlene L. Boruchowitz*
Arlene L. Boruchowitz (0096747)
**MILBERG, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (771) 474-1064
aboruchowitz@milberg.com

Joseph M. Lyon (0076050)
Clint C. Watson (0078378)
Kevin M. Cox (0099584)
**THE LYON FIRM, ALC**
2754 Erie Ave.
Cincinnati, Ohio 45208
Phone: (513) 381-2333
*jlyon@thelyonfirm.com*
*cwatson@thelyonfirm.com*
*kcox@thelyonfirm.com*

Alexandra Mormile*
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
E: lloginov@shamisgentile.com

***Counsel for Plaintiff and the Putative Class***
* *pro hac vice* forthcoming

**MARYELLEN O'SHAUGHNESSY**

**FRANKLIN COUNTY CLERK OF COURTS**
**GENERAL DIVISION, COURT OF COMMON PLEAS**

**CASE TITLE: S P ET AL -VS- CENTRAL OHIO UROLOGY GROUP LLC** **CASE NUMBER: 26CV006898**

TO THE CLERK OF COURTS, YOU ARE INSTRUCTED TO MAKE:
CERTIFIED MAIL

DOCUMENTS TO BE SERVED:
**COMPLAINT**

PROPOSED DOCUMENTS TO BE SERVED:

UPON:
CENTRAL OHIO UROLOGY GROUP LLC
620 MORRISON ROAD
SUITE B
GAHANNA, OH 43230

JUVENILE CITATIONS ONLY:

HEARING TYPE:

Date already scheduled at : Court Room:

**Electronically Requested by:** Arlene L. Boruchowitz
**Attorney for:**

E4510 - C31

MARYELLEN O'SHAUGHNESSY
FRANKLIN COUNTY CLERK OF COURTS
CIVIL DIVISION
345 SOUTH HIGH STREET
1ST FLOOR
COLUMBUS OHIO 43215

USPS CERTIFIED MAIL

9414 8149 0350 3866 0805 59

***FORWARDING SERVICE REQUESTED***

CENTRAL OHIO UROLOGY GROUP LLC
620 MORRISON ROAD
SUITE B
GAHANNA, OH 43230

26CV006898 CENTR C ADDR: 1
96747 ARLENE L. BORUCHOWITZ
07/27/2026
SERVICE ITEM CODE: 01 - ORIGINAL SUMMONS

26CV006898CENTR 202607240016

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO
2026 JUL 28 PM 3:57
CLERK OF COURTS

E4510 - F85

MARYELLEN O'SHAUGHNESSY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

S P
C/O ARLENE BORUCHOWITZ
MILLBERG PLLC
800 S GAY STREET STE 1100
KNOXVILLE, TN 37929,
PLAINTIFF,
VS.
CENTRAL OHIO UROLOGY GROUP LLC
620 MORRISON ROAD
SUITE B
GAHANNA, OH 43230,
DEFENDANT.

26CV-07-6898
CASE NUMBER

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO
2026 JUL 28 AM 11:33
CLERK OF COURTS

**** SUMMONS **** 07/24/26

TO THE FOLLOWING NAMED DEFENDANT:
CENTRAL OHIO UROLOGY GROUP LLC
620 MORRISON ROAD
SUITE B
GAHANNA, OH 43230

YOU HAVE BEEN NAMED DEFENDANT IN A COMPLAINT FILED IN FRANKLIN COUNTY COURT OF COMMON PLEAS, FRANKLIN COUNTY HALL OF JUSTICE, COLUMBUS, OHIO,
BY: S P
C/O ARLENE BORUCHOWITZ
MILLBERG PLLC
800 S GAY STREET STE 1100
KNOXVILLE, TN 37929, PLAINTIFF(S).

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF THE PLAINTIFF'S ATTORNEY IS:
ARLENE L. BORUCHOWITZ
MILBERG, PLLC
800 S. GAY STREET
SUITE 1100
KNOXVILLE, TN 37929

YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

MARYELLEN O'SHAUGHNESSY
CLERK OF THE COMMON PLEAS
FRANKLIN COUNTY, OHIO

BY: WILLIAM SIELOFF, DEPUTY CLERK

(CIV370-S03)

0H997 - K77 Franklin County Ohio Clerk of Courts of the Common Pleas- 2026 Aug 18 12:38 PM-26CV006898

**MARYELLEN O'SHAUGHNESSY**

**FRANKLIN COUNTY CLERK OF COURTS**
**GENERAL DIVISION, COURT OF COMMON PLEAS**

**CASE TITLE: S P ET AL -VS- CENTRAL OHIO UROLOGY GROUP LLC** **CASE NUMBER: 26CV006898**

TO THE CLERK OF COURTS, YOU ARE INSTRUCTED TO MAKE:
CERTIFIED MAIL

DOCUMENTS TO BE SERVED:
**COMPLAINT FILED Filed: 2026-07-24**

PROPOSED DOCUMENTS TO BE SERVED:

UPON:
CENTRAL OHIO UROLOGY GROUP LLC
C/O CT CORP SYSTEM
4400 EASTON COMMONS WAY
SUITE 125
COLUMBUS, OH 43219

JUVENILE CITATIONS ONLY:

HEARING TYPE:

Date already scheduled at : Court Room:

**Electronically Requested by:** Joseph M Lyon
**Attorney for:** S P

MARYELLEN O'SHAUGHNESSY
FRANKLIN COUNTY CLERK OF COURTS
CIVIL DIVISION
345 SOUTH HIGH STREET
1ST FLOOR
COLUMBUS OHIO 43215

USPS CERTIFIED MAIL

9414 8149 0350 3866 1232 01

***FORWARDING SERVICE REQUESTED***

CENTRAL OHIO UROLOGY GROUP LLC
C/O CT CORP SYSTEM
4400 EASTON COMMONS WAY
SUITE 125
COLUMBUS, OH 43219

26CV006898 CENTR C ADDR: 2
76050 JOSEPH M. LYON
08/18/2026
SERVICE ITEM CODE: 01 - ORIGINAL SUMMONS

26CV006898CENTR 202608180001

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO
2026 AUG 19 PM 4:51
CLERK OF COURTS

E4526 - X96

MARYELLEN O'SHAUGHNESSY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

S P
C/O ARLENE BORUCHOWITZ
MILLBERG PLLC
800 S GAY STREET STE 1100
KNOXVILLE, TN 37929,
PLAINTIFF,
VS.
CENTRAL OHIO UROLOGY GROUP LLC
C/O CT CORP SYSTEM
4400 EASTON COMMONS WAY
SUITE 125
COLUMBUS, OH 43219,
DEFENDANT.

26CV-07-6898
CASE NUMBER

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO
2026 AUG 19 PM 4:42
CLERK OF COURTS

**** SUMMONS **** 08/18/26

TO THE FOLLOWING NAMED DEFENDANT:
CENTRAL OHIO UROLOGY GROUP LLC
C/O CT CORP SYSTEM
4400 EASTON COMMONS WAY
SUITE 125
COLUMBUS, OH 43219

YOU HAVE BEEN NAMED DEFENDANT IN A COMPLAINT FILED IN FRANKLIN COUNTY COURT OF COMMON PLEAS, FRANKLIN COUNTY HALL OF JUSTICE, COLUMBUS, OHIO,
BY: S P
C/O ARLENE BORUCHOWITZ
MILLBERG PLLC
800 S GAY STREET STE 1100
KNOXVILLE, TN 37929, PLAINTIFF(S).

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF THE PLAINTIFF'S ATTORNEY IS:
JOSEPH M. LYON
THE LYON FIRM
2754 ERIE AVE
CINCINNATI, OH 45208

YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

MARYELLEN O'SHAUGHNESSY
CLERK OF THE COMMON PLEAS
FRANKLIN COUNTY, OHIO

BY: STEVEN MANION, DEPUTY CLERK

(CIV370-S03)

**MARYELLEN O'SHAUGHNESSY**

**FRANKLIN COUNTY CLERK OF COURTS**
**GENERAL DIVISION, COURT OF COMMON PLEAS**

**CASE TITLE: S P ET AL -VS- CENTRAL OHIO UROLOGY GROUP LLC** **CASE NUMBER: 26CV006898**

TO THE CLERK OF COURTS, YOU ARE INSTRUCTED TO MAKE:
CERTIFIED MAIL

DOCUMENTS TO BE SERVED:
**COMPLAINT FILED Filed: 2026-07-24**

PROPOSED DOCUMENTS TO BE SERVED:

UPON:
CENTRAL OHIO UROLOGY GROUP LLC
701 TECH CENTER DRIVE
GAHANNA, OH 43230

JUVENILE CITATIONS ONLY:

HEARING TYPE:

Date already scheduled at : Court Room:

**Electronically Requested by:** Joseph M Lyon
**Attorney for:** S P

E4531 - E29

MARYELLEN O'SHAUGHNESSY
FRANKLIN COUNTY CLERK OF COURTS
CIVIL DIVISION
345 SOUTH HIGH STREET
1ST FLOOR
COLUMBUS OHIO 43215

USPS CERTIFIED MAIL

9414 8149 0350 3866 1348 18

***FORWARDING SERVICE REQUESTED***

CENTRAL OHIO UROLOGY GROUP LLC
701 TECH CENTER DRIVE
GAHANNA, OH 43230

26CV006898 CENTR C ADDR: 3
76050 JOSEPH M. LYON
08/25/2026
SERVICE ITEM CODE: 01 - ORIGINAL SUMMONS

26CV006898CENTR 202608250001

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO
2026 AUG 25 PM 4:10
CLERK OF COURTS

E4531 - G20

MARYELLEN O'SHAUGHNESSY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

S P
C/O ARLENE BORUCHOWITZ
MILLBERG PLLC
800 S GAY STREET STE 1100
KNOXVILLE, TN 37929,
PLAINTIFF,
VS.
CENTRAL OHIO UROLOGY GROUP LLC
701 TECH CENTER DRIVE
GAHANNA, OH 43230,

DEFENDANT.

26CV-07-6898
CASE NUMBER

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO
2026 AUG 26 PM 3:53
CLERK OF COURTS

**** SUMMONS **** 08/25/26

TO THE FOLLOWING NAMED DEFENDANT:
CENTRAL OHIO UROLOGY GROUP LLC
701 TECH CENTER DRIVE
GAHANNA, OH 43230

YOU HAVE BEEN NAMED DEFENDANT IN A COMPLAINT FILED IN FRANKLIN COUNTY COURT OF COMMON PLEAS, FRANKLIN COUNTY HALL OF JUSTICE, COLUMBUS, OHIO,
BY: S P
C/O ARLENE BORUCHOWITZ
MILLBERG PLLC
800 S GAY STREET STE 1100
KNOXVILLE, TN 37929, PLAINTIFF(S).

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF THE PLAINTIFF'S ATTORNEY IS:
JOSEPH M. LYON
THE LYON FIRM
2754 ERIE AVE
CINCINNATI, OH 45208

YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

MARYELLEN O'SHAUGHNESSY
CLERK OF THE COMMON PLEAS
FRANKLIN COUNTY, OHIO

BY: STEVEN MANION, DEPUTY CLERK

(CIV370-S03)

E4530

**UNITED STATES POSTAL SERVICE**

Date Produced: 08/24/2026

FRANKLIN COUNTY CLERK OF COURTS PB SPE:

The following is the delivery information for Certified Mail™/RRE item number 9414 8149 0350 3866 1232 01. Our records indicate that this item was delivered on 08/21/2026 at 01:31 p.m. in COLUMBUS, OH 43224. The scanned image of the recipient information is provided below.

Signature of Recipient :

Signature X Dan Kelley CT CORPS

Printed Name Dan Kelley

Address of Recipient :

Delivery Address 4400 Easton Commons

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO
2026 AUG 26 AM 9:01
CLERK OF COURTS

Customer Reference Number: 26CV006898CENTR 202608180001

**MARYELLEN O'SHAUGHNESSY**

**FRANKLIN COUNTY CLERK OF COURTS**
**GENERAL DIVISION, COURT OF COMMON PLEAS**

**CASE TITLE: S P ET AL -VS- CENTRAL OHIO UROLOGY GROUP LLC** **CASE NUMBER: 26CV006898**

TO THE CLERK OF COURTS, YOU ARE INSTRUCTED TO MAKE:
CERTIFIED MAIL

DOCUMENTS TO BE SERVED:
**COMPLAINT FILED Filed: 2026-07-24**

PROPOSED DOCUMENTS TO BE SERVED:

UPON:
CENTRAL OHIO UROLOGY GROUP LLC
701 TECH CENTER DRIVE
SUITE 100
GAHANNA, OH 43230

JUVENILE CITATIONS ONLY:

HEARING TYPE:

Date already scheduled at : Court Room:

**Electronically Requested by:** Joseph M Lyon
**Attorney for:** S P

E4538 - A90

MARYELLEN O'SHAUGHNESSY
FRANKLIN COUNTY CLERK OF
COURTS
CIVIL DIVISION
345 SOUTH HIGH STREET
1ST FLOOR
COLUMBUS OHIO 43215

USPS CERTIFIED MAIL

9414 8149 0350 3866 1536 66

***FORWARDING SERVICE REQUESTED***

CENTRAL OHIO UROLOGY GROUP LLC
701 TECH CENTER DRIVE
SUITE 100
GAHANNA, OH 43230

26CV006898 CENTR C ADDR: 4
76050 JOSEPH M. LYON
09/03/2026
SERVICE ITEM CODE: 01 - ORIGINAL SUMMONS

26CV006898CENTR 202609030001

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO
2026 SEP -4 AM 10: 54
CLERK OF COURTS

Case: 2:26-cv-01187-DRC-CMV Doc #: 6 Filed: 10/02/26 Page: 99 of 101 PAGEID #: 325

MARYELLEN O'SHAUGHNESSY
CLERK OF THE FRANKLIN COUNTY COMMON PLEAS COURT, COLUMBUS, OHIO 43215
CIVIL DIVISION

S P
C/O ARLENE BORUCHOWITZ
MILLBERG PLLC
800 S GAY STREET STE 1100
KNOXVILLE, TN 37929,
PLAINTIFF,
VS.
CENTRAL OHIO UROLOGY GROUP LLC
701 TECH CENTER DRIVE
SUITE 100
GAHANNA, OH 43230,
DEFENDANT.

26CV-07-6898
CASE NUMBER

FILED
COMMON PLEAS COURT
FRANKLIN CO OHIO
2026 SEP -4 AM 11:05
CLERK OF CO...

**** SUMMONS ****

09/03/26

TO THE FOLLOWING NAMED DEFENDANT:
CENTRAL OHIO UROLOGY GROUP LLC
701 TECH CENTER DRIVE
SUITE 100
GAHANNA, OH 43230

YOU HAVE BEEN NAMED DEFENDANT IN A COMPLAINT FILED IN FRANKLIN COUNTY COURT OF COMMON PLEAS, FRANKLIN COUNTY HALL OF JUSTICE, COLUMBUS, OHIO,
BY: S P
C/O ARLENE BORUCHOWITZ
MILLBERG PLLC
800 S GAY STREET STE 1100
KNOXVILLE, TN 37929, PLAINTIFF(S).

A COPY OF THE COMPLAINT IS ATTACHED HERETO. THE NAME AND ADDRESS OF THE PLAINTIFF'S ATTORNEY IS:
JOSEPH M. LYON
THE LYON FIRM
2754 ERIE AVE
CINCINNATI, OH 45208

YOU ARE HEREBY SUMMONED AND REQUIRED TO SERVE UPON THE PLAINTIFF'S ATTORNEY, OR UPON THE PLAINTIFF, IF HE HAS NO ATTORNEY OF RECORD, A COPY OF AN ANSWER TO THE COMPLAINT WITHIN TWENTY-EIGHT DAYS AFTER THE SERVICE OF THIS SUMMONS ON YOU, EXCLUSIVE OF THE DAY OF SERVICE. YOUR ANSWER MUST BE FILED WITH THE COURT WITHIN THREE DAYS AFTER THE SERVICE OF A COPY OF THE ANSWER ON THE PLAINTIFF'S ATTORNEY.

IF YOU FAIL TO APPEAR AND DEFEND, JUDGMENT BY DEFAULT WILL BE RENDERED AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

MARYELLEN O'SHAUGHNESSY
CLERK OF THE COMMON PLEAS
FRANKLIN COUNTY, OHIO

BY: STEVEN MANION, DEPUTY CLERK

(CIV370-S03)

E4538

UNITED STATES POSTAL SERVICE

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO

2026 SEP -8 AM 10: 46

CLERK OF COURTS

Date Produced: 09/07/2026

FRANKLIN COUNTY CLERK OF COURTS PB SPE:

The following is the delivery information for Certified Mail™/RRE item number 9414 8149 0350 3866 1348 18. Our records indicate that this item was delivered on 09/01/2026 at 11:24 a.m. in COLUMBUS, OH 43230. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient : 701 TECH CENTER DR, COLUMBUS, OH 43230

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number: 26CV006898CENTR 202608250001

**The Honorable Maryellen O'Shaughnessy**
Franklin County Clerk of Courts

General Division
345 South High Street, 1st Floor
Columbus, Ohio 43215
614.525.3621

**Transfer Letter**

S P ET AL vs Central Ohio Urology Group LLC

Case Number: 26CV6898

The State of Ohio, Franklin County, ss

Dear Sir/Madam,

On this date, certified copies of the above-named case and a printout of the docket was sent to the following address per order of the Judge or Magistrate:

**U.S District Court**
**U.S District Court, 85 Marconi Blvd Columbus, Ohio 43215**

I, Maryellen O'Shaughnessy, Clerk of the Court of Common Pleas within and for said county, hereby certify that the above and foregoing is truly taken and copied from the original papers now on file in my office. The total number of pages is 92

Witness my hand and seal of said court Maryellen O'Shaughnessy on 9/29/2026

Maryellen O'Shaughnessy

Clerk of the Court of Common Pleas

Please call us at (614) 525-3621, if you have any questions. Thank you.